**MOTOROLA, INC., Petitioner-Appellee,**

**v.**

**Elmer W. McLAIN, Regional Director, Equal Employment Opportunity Commission of the United States, Defendant-Appellant.**

**Nos. 72–1748, 72–1749.**

United States Court of Appeals,
Seventh Circuit.

Argued May 30, 1973.

Decided Sept. 10, 1973.

Rehearing Denied Oct. 2, 1973.

Julia P. Cooper, Charles Reischel, Equal Employment Opportunity Commission, Washington, D. C., for defendant-appellant.

Robert V. Nystrom, Chicago, Ill., for petitioner-appellee.

Before FAIRCHILD and SPRECHER, Circuit Judges, and REYNOLDS, District Judge.*

SPRECHER, Circuit Judge.

These two appeals require us to delineate the scope of the Equal Employment Opportunity Commission's investigatory powers under Title VII of the Civil Rights Act of 1964.

I

In No. 72–1748 (the Taggart case), Lillian Taggart filed a charge on February 2, 1970, with the Equal Employment Opportunity Commission (EEOC) pursuant to Section 706(a) of Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e—5(a) (1971)), alleging that petitioner, Motorola, Inc., had discriminated against her "because of [her] race (Negro)."

Ms. Taggart's affidavit alleged that she commenced employment at petitioner's Communications Plant, 4545 West Augusta Boulevard, Chicago, as an assembler on April 27, 1964, and worked as productivity clerk from 1966 to 1967 and as an inspector, tester, analyzer and repairer from 1967 to September 24, 1970, the date the affidavit was executed; that in April, 1969, she was told by Assistant Foreman, Chuck Mortell, to prepare herself to fill a supervisory vacancy by learning more about testing equipment and analyzing procedure inasmuch as her supervisor, Leslie Chapman, was transferring to another department and Mortell expected that she would fill that vacancy; that about 18 days later Chapman informed her that his vacancy was to be filled by a white, male, newly-hired employee, Tom Donley; that when

---

* District Judge John W. Reynolds of the Eastern District of Wisconsin is sitting by designation.

she complained to Mortell, he said that Donley wasn't filling the vacancy but "was merely learning the operation" and if he did not work out, she would replace him; that she complained to Dick Brennan in the personnel department, who said he would look into the matter and about one month later told her Donley was a technician, not a supervisor; that in October, 1969, Mortell told her that Donley was her supervisor; that she was then in the highest classification in her department section and the next step would be group leader, key operator or supervisor; that Donley was frequently absent and was discharged in January, 1970, for poor attendance; that Jim Rich, a supervisor from another department, took over until March 23, 1970, when he was replaced by Stanley Swarek, who was transferred from another department where he had been supervisor; that her complaints to the petitioner went unanswered; that no equal employment posters were on the petitioner's bulletin boards; that in 1969 there were 10 black employees in her department and at present there were two; and that the petitioner suggested that she take a technician's test, but she protested that no white supervisors were required to take this test.

In No. 72–1749 (the Shannon case), Christine Shannon filed a charge on February 4, 1970, with EEOC, alleging in connection with her employment at petitioner's Augusta Boulevard plant, the following:

"I was attacked by the Company Guard (white) while entering the plant to work. After a witness came forward and told what she saw, the Company asked me to forget it and told me that the guard would be stationed somewhere where I would not see him. I was told that if anything else happens, I will be transferred from my department, after being there for one year. I do not want to transfer departments, but I am afraid that if I don't accept, I may be fired. I work in a department consisting of approximately 25 whites where I am the only black, and I do the hardest job in the department. Everyone in there has at least 10 years of experience. I have 3 years with the Company, and I have the highest production rate in the department. Also, I believe the company maintains segregated seniority lines."

In accordance with Section 706(b) of Title VII (42 U.S.C. 2000e—5(b)), requiring charging parties to exhaust their remedies before state fair employment practices commissions, EEOC deferred the two charges until receiving notification on February 26, 1970, that Lillian Taggart's charge, and on March 30, 1970, that Christine Shannon's charge had been dismissed by the Illinois Fair Employment Practices Commission. The charges were considered filed with EEOC upon termination of state proceedings and upon receipt by EEOC of notification thereof pursuant to Section 1601.12(b)(IV) of EEOC Procedural Regulations (29 C.F.R. § 1601.12b(4) (1973)).

On September 29, 1970, an investigator from EEOC's Chicago office attempted to serve both charges on the petitioner, whose representatives on advice of counsel refused to receive service and refused to produce requested documents and information.

On May 5, 1971, EEOC served petitioner with a Demand for Access to Evidence in both cases. On May 17, petitioner filed two separate actions in the district court pursuant to Section 710(c) of Title VII (42 U.S.C. § 2000e—9(c)) praying for modification of the demand as to certain of its requirements.

On June 14, 1972, the district court, upon appeal from a magistrate who heard arguments by counsel for petitioner and EEOC, ordered in the Taggart case that the petitioner need not comply with the Demand and neither produce nor grant access to:

1. The most recent E.E.O.–1 form regarding the makeup of the work force in

the plant located at 9401 West Grand Avenue, Franklin Park, Illinois.

2. All records and personnel relating to Charge No. TCHO 0794 [the Taggart charge].

3. The complete personnel records maintained by Motorola, Inc. for the following:

    (A) Thomas Donnelly;

    (B) Les Chapman;

    (C) James Rich; and

    (D) Stanley Swarek (phonetic spelling),

if such persons are employed by Motorola, Inc.

4. Home address and telephone number of James Mortell if such person is employed by Motorola, Inc.

5. Home address and telephone number of Richard Brennan, if such person is employed by Motorola, Inc.

6. A tour of the plant facilities located at 4545 West Augusta Boulevard, Chicago, Illinois.

In the Shannon case, the district court ordered on June 14, 1972, that the petitioner need not comply with the Demand and neither produce nor grant access to the following:

List of all incumbent employees hourly and salaried, designating race, sex, present labor grade, present job classification, present department, job code (or other applicable code), and all seniority dates for whatever purpose used by the company. If seniority is by job classification or department, such list shall be prepared by seniority date. If no such seniority date is maintained such list shall be furnished alphabetically by name of employee.

EEOC has appealed both orders.

## II

Section 709(a) of Title VII (42 U.S.C. § 2000e—8(a)) provides that "the Commission or its designated representative shall at all reasonable times have access to . . . . and the right to copy *any*

*evidence* of any person being investigated or proceeded against *that relates to* unlawful employment practices . . . *and is relevant to* the charge under investigation." At the time the charges were filed, Section 710(a) provided that "the Commission shall have authority to examine witnesses under oath and to require the production of documentary *evidence relevant or material to* the charge under investigation." 42 U.S.C. § 2000e—9(a) (1971) (emphasis added).

In General Employment Enterprises, Inc. v. Equal Employment Opportunity Commission, 440 F.2d 783, 784 (7th Cir. 1971), we enforced the EEOC's Demand for Access to Evidence under Sections 709(a) and 710(a) as "consistent with the broad remedial purposes of the Act which could only be thwarted by sustaining technical defenses of alleged violators."

Most of the courts which have considered the scope of the investigatory powers of EEOC have agreed that they are broad. Blue Bell Boots, Inc. v. Equal Employment Opportunity Commission, 418 F.2d 355, 358 (6th Cir. 1969) ("Title VII . . . should not be construed narrowly . . ."); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 425 (8th Cir. 1970) ("Title VII of the Civil Rights Act of 1964 is to be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination"). One district court which sought to find that "Congress intended to deny the Commission the broad investigatory powers of other federal agencies . . . ." was expressly reversed by the Court of Appeals. Graniteville Co. v. Equal Employment Opportunity Commission, 316 F.Supp. 1177, 1185 (D.S. Car.1969), rev'd, 438 F.2d 32, 39 (4th Cir. 1971).

The only voice arguing for a presumed narrower grant of authority is Georgia Power Co. v. Equal Employment Opportunity Commission, 412 F.2d 462,

467–468 (5th Cir. 1969) and that view was based primarily on Senator Dirksen's question during debate in 1964: "What protection is afforded to an employer from fishing expeditions by investigators, in their zeal to enforce Title VII?" 2 Statutory History of the United States: Civil Rights 1176 (B. Schwartz ed. 1970).[1] The "fishing expedition" language has been repeated occasionally (Parliament House Motor Hotel v. Equal Employment Opportunity Commission, 444 F.2d 1335, 1339 (5th Cir. 1971)) and has been echoed by the petitioner in the present appeals. Brief for Appellee at 7, No. 72–1748.

When the Supreme Court was considering Federal Rule of Civil Procedure 26(b)(1), which reads in part that discovery may be obtained "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," it said in Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947):

> "We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case."

In finding that Congress intended a broad interpretation of Sections 709(a) and 710(a), Judge Sobeloff in Graniteville Co. v. Equal Employment Opportunity Commission, 438 F.2d at 39, said:

> "Our reading of legislative history . . . suggests . . . that the

investigatory powers of the EEOC were intended to equal in scope those granted the National Labor Relations Board under the Taft-Hartley Act, 29 U.S.C. §§ 151 et seq., 161."

In National Labor Relations Board v. Wyman-Gordon Co., 394 U.S. 759, 768, 89 S.Ct. 1426, 1431, 22 L.Ed.2d 709 (1969), the Supreme Court, in upholding the power of the Board to require an employer to furnish a list of names and addresses of employees eligible to vote in a representation election as within the scope of Section 11 of the National Labor Relations Act (29 U.S.C. § 161),[2] held that the investigatory power extended to "books and records and other papers which will be of assistance to the Board in conducting a particular investigation."

Judge Sobeloff proved to be prophetic when he equated Sections 709(a) and 710(a) with 29 U.S.C. § 161 since Congress, in passing the Equal Employment Opportunity Act of 1972 which became effective on March 24, 1972, amended Section 710 to read as follows:

> "For the purpose of all hearings and investigations conducted by the Commission or its duly authorized agents or agencies, section 161 of Title 29 shall apply." 42 U.S.C.A. § 2000e—9 (Supp.Pamphlet, 1972).

Although Congress was not entirely clear as to whether amended Section 710 was to apply to prior filed but pending charges,[3] as those here, this is not significant inasmuch as Congress was clear that the change in that section was

---

1. Due primarily to Senator Dirksen's efforts, a portion of the language of Section 709(a) was changed from "relates to any matter under investigation or in question" to the enacted language "relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation."

2. Section 11(1) provides in part that the Board shall have access to "any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question."

3. A section of the bill as reported by the House which read, "Section 706 and 710 of the Civil Rights Act of 1964, as amended by this Act, shall not be applicable to charges filed with the Commission prior to the effective date of this Act" (U.S.Code Cong. & Ad.News 2166 (1972)), was deleted in conference and the following was substituted: "The amendments made by this Act to section 706 of the Civil Rights Act of 1964 shall be applicable with respect to charges pending with the Commission on the date of enactment of this Act and all charges filed thereafter" (U.S.Code Cong. & Ad.News 135 (1972)).

"comparable" to the section prior to amendment (U.S. Code Cong. & Admin. News 2164 (1972)) and we agree with Judge Sobeloff that the original language was "equal in scope" to 29 U.S.C. § 161.

If there was any doubt as to the Congressional intention that the original language of Title VII be construed and applied broadly, it was dissipated by the unequivocal intention expressed in the passing of the 1972 amendments to that title.

House Report No. 92–238 (92d Cong., 2d Sess. 1972; reprinted in U.S.Code Cong. & Admin.News 2141, 2143–44 (1972)) noted the following:

"The time has come to bring an end to job discrimination once and for all, and to insure every citizen the opportunity for the decent self-respect that accompanies a job commensurate with one's abilities. The hopeful prospects that Title VII offered millions of Americans in 1964 must be revived.

\* \* \* \* \* \*

"During the preparation and presentation of Title VII of the Civil Rights Act of 1964, employment discrimination tended to be viewed as a series of isolated and distinguishable events, due, for the most part, to ill-will on the part of some identifiable individual or organization.

\* \* \* \* \* \*

"Employment discrimination, as we know today, is a far more complex and pervasive phenomenon. Experts familiar with the subject generally describe the problem in terms of 'systems' and 'effects' rather than simply intentional wrongs. The literature on the subject is replete with discussions of the mechanics of seniority and lines of progression, perpetuation of the present effects of earlier discriminatory practices through various institutional devices, and testing and validation requirements.

\* \* \* \* \* \*

"It is increasingly obvious that the entire area of employment discrimination is one whose resolution requires not only expert assistance, but also the technical perception that a problem exists in the first place, and that the system complained of is unlawful."

The Supreme Court has also shed additional light on Title VII in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973), where Mr. Justice Powell said:

"The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens. . . .

"There are societal as well as personal interests on both sides of this equation. The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise."

The Court held that a complainant establishes a prima facie case of racial discrimination by showing (1) that he belongs to a racial minority, (2) that he applied and was qualified for a job for which the employer was seeking applicants, (3) that despite his qualifications, he was rejected, and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the complainant's rejection. Obviously this will always be forthcoming, if on no other basis, for the non-racial

reason that complainant lacked the necessary qualifications for the position. This results in a shift of the burden back to the complainant, who must be afforded a fair opportunity to show that . . . [the employer's] stated reason for . . . [the employee's] rejection was in fact pretext. 411 U.S. at 804, 93 S.Ct. at 1825. Mr. Justice Powell then detailed the manner in which the complainant must be given an opportunity to establish pretextuality (411 U.S. at 804, 93 S.Ct. 1825–1826):

> "Other evidence that may be relevant to any showing of pretextuality includes facts as to the petitioner's treatment of respondent during his prior term of employment, petitioner's reaction, if any, to respondent's legitimate civil rights activities, and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks. . . . In short, on the retrial respondent must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision."

### III

In the Taggart case (No. 72–1748), the complainant established a prima facie case of racial discrimination by her charge and affidavit. The petitioner has not admitted racial discrimination and it can be presumed that it will proffer a non-racial reason for failing to promote complainant. Inasmuch as evidence is admissible to establish pretextuality, the investigatory powers of EEOC to determine whether reasonable cause exists to believe a violation of Title VII has occurred, obviously extend at least as far. As Chief Judge Swygert held in construing Section 11 of the National Labor Relations Act (29 U.S.C. § 161) in N.L.R.B. v. Rohlen, 385 F.2d 52, 57 (7th Cir. 1967):

> "Thus, if the material subpoenaed touches a matter under investigation, it is within the scope of section 11(2) even though the material may not be considered 'evidence' as the term is employed in the courtroom."

*Accord,* N.L.R.B. v. Wyman-Gordon Co., 394 U.S. at 768–769, 89 S.Ct. at 1430–1431.

The pretextuality issue encompasses the employer's "general employment policy and practice," a search for "a general pattern of discrimination against blacks," and a determination of whether "valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." Congress has alerted EEOC to look for "systems" and "effects" of discrimination.

In the Shannon case (No. 72–1749), the complainant's charge also sets forth a prima facie case of racial discrimination, which will require investigation of the pretextuality issue. The complainant further charges that she believes "the company maintains segregated seniority lines." The Taggart charge referred to a test requirement that was not applied to white employees. Both complainants filed their charges in early 1970, long before Congress warned that "[t]he literature on the subject is replete with discussions of the mechanics of seniority and lines of progression, perpetuation of the present effects of earlier discriminatory practices through various institutional devices, and testing and validation requirements."[4]

In view of the board investigatory powers intended to be given to

---

4. H.R.Rep.No.92–238, 92d Cong., 2d Sess. (1972); reprinted in U.S.Code Cong. & Ad.News 2144 (1972).

EEOC, all of the items to which the district court denied it access were properly sought under Section 709(a) and 710(a) of Title VII.

In the Taggart matter, all records relating to that charge, the personnel records for the employees specifically named in that charge, and the address and telephone numbers of two other employees expressly named in the charge, are so clearly required to be made available that the employer's refusal was not only "technical" but close to frivolous. The other two items sought—the EEOC form regarding the make-up of the work force in petitioner's plant in Franklin Park (a Chicago suburb) and a tour of the Chicago plant—both fall well within EEOC's responsibilities and powers. A plant tour may be extremely significant and relevant.

The only item sought in the Shannon matter—a list of all employees with information relating to seniority—is also well within EEOC's powers.[5]

There is nothing unique about a requirement to compile and furnish lists, names, addresses and telephone numbers. N.L.R.B. v. Wyman-Gordon Co., 394 U.S. at 767–775, 89 S.Ct. 1426, 22 L.Ed.2d 709; Local No. 104 v. Equal Employment Opportunity Commission, 439 F.2d 237, 243 (9th Cir. 1971).

A single charge may "launch a full scale inquiry." Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968); Parham v. Southwestern Bell Telephone Co., 433 F.2d at 425; Cameron Iron Works, Inc. v. Equal Employment Opportunity Commission, 320 F.Supp. 1191, 1194 (S.D.Tex.1970).

We reverse the orders of the district court in both cases insofar as they deny access to any requested item and we re-

mand with directions to enforce the Commission's Demands for Access to Evidence in every respect.

Reverse and remand.

---

5. Counsel for EEOC represented to the magistrate that this requested item "refers to the Augusta [Boulevard, Chicago] and Franklin Park plants" (App. at 54, No. 72–1749. See also, App. at 58–59). EEOC has not sought this information from any of petitioner's plants throughout the country other than these two specific plants in the Chicagoland area.