**NEW ORLEANS PUBLIC SERVICE, INC., Plaintiff,**

v.

**William H. BROWN, III, Chairman, et al. Defendants.**

**No. 72–2446.**

United States District Court, E. D. Louisiana.

Jan. 16, 1974.

Michael J. Molony, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiff.

Diane S. Greenberg, E. E. O. . C., Washington, D. C., for defendants.

JACK M. GORDON, District Judge:

The Plaintiff, New Orleans Public Service, Inc., instituted this action to quash an administrative subpoena duces tecum issued by the defendant, Equal Employment Opportunity Commission and to enjoin an administrative investigation currently being conducted by the defendant. Civil Rights Act of 1964, Title VII, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–9. The Equal Employment Opportunity Commission answered plaintiff's complaint and counterclaimed to compel compliance with the subpoena in question. Shortly thereafter, the defendants filed a motion, pursuant to Rule 81(a)(3) of the Federal Rules of Civil Procedure, requesting the Court to order the plaintiff to comply with the defendant's subpoena duces tecum, or alternatively, for summary judgment, under Rule 56, denying injunctive relief and directing plaintiff to satisfy the subpoena. The primary question for determination is whether the information sought in the subpoena is material and relevant to the charges of discrimination filed against the plaintiff and presently being investigated by the defendant, Equal Employment Opportunity Commission.

## FACTS

A chronological background first is in order. Between May 5, 1971, and July 30, 1971, six individual charges complaining of racial discrimination in hiring, promotion, discharge and other miscellaneous conditions of employment in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., were filed with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC" or "Commission") against New Orleans Public Service, Inc. (hereinafter referred to as "NOPSI"). On January 4, 1972, a commissioner's charge of racial, religious, sex, and national origin discrimination with respect to recruitment, hiring, job assignment, seniority, promotion, representation, training, and sundry terms of employment was filed with the Commission against NOPSI and three labor unions. On or about January 26, 1972, NOPSI was served with copies of these seven charges of employment discrimination together with a request for production of certain documents. NOPSI did not comply with the request. On August 11, 1972, the EEOC issued a subpoena duces tecum in accordance with 42 U.S. C. § 2000e–9, as amended in 1972. The subpoena commanded a representative of NOPSI to appear on August 18, 1972, before the Commission with documents that purportedly were material and relevant to the charges under investigation. NOPSI timely petitioned the Commission to revoke the subpoena, but the Commission rejected NOPSI's petition on August 29, 1972. The Commission, however, did modify the subpoena duces tecum to the extent of excusing plaintiff from the production and delivery of any documents NOPSI previously had furnished the Commission in connection with other individual charges against NOPSI, which charges have been investigated and processed.

Albeit this case is not one of first impression in the employment discrimination field, it is one whose facts markedly have made an impression on the conscience of the Court. Hence, the factual allegations and accompanying legal position of the respective parties must be ventilated thoroughly at this juncture.

NOPSI contends that it has offered to produce the necessary documents and information relevant to the charges filed with the Commission by the six individuals in EEOC cases numbered TNO–1–1036, TNO–2–0057, TNO–2–0075, TNO–1–1029, TNO–1–1093, and TNO–2–0058. Reference to the individual charging parties and the departments in which they were employed or sought employment, argues NOPSI, cannot support the

overly broad subpoena duces tecum requesting extensive data and documents concerning the defendant company's practices in each of its eighteen divisions. Rather, the access to the massive volumes of employment information can only be based on the charge by the Chairman of the EEOC in Case No. TNO-2-0692. NOPSI thus reasons that enforcement of the controverted subpoena duces tecum would impose such an unreasonable burden as to constitute a violation of the company's Fourth Amendment protections. Oklahoma Press Publishing Co. v. Walling, 327 U. S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Additionally, since the thrust of the subpoena is founded on the commissioner's charge, NOPSI closely scrutinizes the validity, if any, of the commissioner's charge. In particular, NOPSI attacks the commissioner's charge against NOPSI for its refusal or failure to have corrected between July, 1965, and January, 1972, the imbalance between the percentage of Negroes, Spanish-surnamed Americans, members of the Jewish faith, and females employed by NOPSI in each of its departments and the percentages of those minorities within the total population of New Orleans, Louisiana. NOPSI defends its failure to grant preferential treatment to such minority groups during the aforesaid time span by alluding to Section 703(j) of the Civil Rights Act, 1964, 42 U.S.C. § 2000e-2 which provision, it contends, specifically prohibits such favoritism. NOPSI states, a fortiorari, that an invalid charge cannot support the enforcement of a subpoena that is based on such a charge. Sections 706, 709(a) and 710 of the Civil Rights Act, 1964, 42 U.S.C. §§ 2000e-5, 2000e-8, and 2000e-9. Alternatively, NOPSI proposes that Title VII places a "relevancy" limitation on any subpoena issued by the Commission, that is, that the requested information must be relevant to the charge under investigation, and, the disproportionate scope of the subpoena in contest vis-à-vis the individual charges inherently prevents the detection of a relevancy standard.

Besides constituting a burden in contravention of its Fourth Amendment rights, NOPSI indicates that it would sustain a serious economic burden if it were compelled to comply with the outstanding subpoena.

Believing the 1972 amendments to the Civil Rights Act control the case sub judice, NOPSI points out another apparent defect in this proceeding by the Commission: refusal or inability by the Commission to furnish the date, place, and circumstances of the alleged employment malpractices contained in the commissioner's charge and failure by Commissioner Brown to submit his charge under oath, pursuant to Section 706(b) of the Civil Rights Act, as amended in 1972. NOPSI hastens to add that nowhere in the commissioner's charge is it contended that said charge is an investigation of a pattern or practice of discrimination on the part of NOPSI.

Rebutting the assertions of NOPSI, the EEOC argues that there are no grounds for granting NOPSI the relief it seeks, and therefore, the subpoena should be enforced. The EEOC classifies the six individual charges of employment discrimination as follows: 1) refusal to employ Negroes because of race; 2) refusal to employ Negroes because of racial characteristics; 3) discharge because of race; 4) racially segregated job facilities; and 5) racially discriminatory terms and conditions of employment. Due to the Commission's broad investigatory powers, the EEOC submits, any one of the individual charges by itself would support the subpoena duces tecum issued in this case. The commissioner's charge, argues the EEOC, equally would warrant an in-depth investigation into NOPSI's employment practices.

With respect to the commissioner's failure to delineate specific acts of discriminatory behavior, the EEOC responds that the jurisprudence clearly has sustained charges containing conclusory

allegations of patterns and practices of discriminatory behavior, similar to the present charge at issue. Illustrative of this judicial attitude, the EEOC states, are Motorola, Inc. v. McLain, 484 F.2d 1339 (7th Cir. 1973), Joslin Dry Goods Co. v. EEOC, 483 F.2d 178 (10th Cir. 1973); Sparton Southwest, Inc. v. EEOC, 461 F.2d 1055 (10th Cir. 1972); Sheet Metal Workers' International Assn., Local 104 v. EEOC, 439 F.2d 237 (9th Cir. 1971). Continuing this line of reasoning, the EEOC argues that the function of an EEOC charge is merely to activate the investigative processes of the Commission, and, it is not until the investigative machinery has been operative for a reasonable duration that detailed proof of discrimination is required. In the alternative, the EEOC states that if the 1972 amendments are applicable, the information concerning the "date, place and circumstances" of the alleged discrimination, pursuant to Section 706(b) of the amended Civil Rights Act, is present in each of the seven charges. The EEOC suggests that all of the individual charges contain the date and place and at least some of the circumstances of the alleged unlawful employment practices, and, that the commissioner's charge equally specifies the statutory requisites. More particularly, the EEOC argues that the commissioner's charge alleges daily discrimination against its employees and applicants for employment in its main office and in all other employee facilities, and that the enumerated discriminatory employment practices constitute the circumstances of the alleged wrongs.

The EEOC asserts that the purpose of the statistical analysis incorporated in the commissioner's charge is to establish a prima facie case of work discrimination; see, e. g., Stamps v. Detroit Edison Co., 365 F.Supp. 87 (E.D.Mich., 1973). Moreover, the EEOC submits that Section 703(j) of the Civil Rights Act, 42 U.S.C. § 2000e-2 is not contravened through usage of these figures since that section is directed to remedies for Title VII violations and is not a bar to the presentation by the EEOC of statistical data during the charging or investigatory stages.

At the time the Court entertained oral argument on the respective motions of each party, another legal question was raised by the Court, to wit: Whether the 1972 amendments to Title VII should be applied retroactively, and if so, what effect would this application have on the commissioner's charge. A key revision caused by the 1972 amendments markedly altered the guidelines for making a commissioner's charge. Prior to the amendments a commissioner filed a charge with the EEOC if he had a "reasonable cause to believe" the charge to be true; Section 706(a), 42 U.S.C. § 2000e-5(a); the amended Civil Rights Act now requires the commissioner to file a charge under oath or affirmation, Section 706(b), 42 U.S.C. § 2000e-5(b).

Referring to the subpoena duces tecum in the abstract concept of an ordinary subpoena is meaningless in the course of discussing its merits; the scope of the requested information must be made known, and, accordingly, the requests made by the EEOC subpoena duces tecum in question are reproduced in toto as Appendix A.

To its credit, NOPSI voluntarily has supplied a large quantity of answers in response to the Commission's remarkably broad subpoena. In a well detailed affidavit containing a considerable amount of statistical information, James M. Cain, a NOPSI Vice-President in Charge of Administration, which department oversees the company's personnel division, outlined NOPSI's operating procedures and policies with respect to the equal employment opportunity laws. Testifying during the hearing on the motion for summary judgment by the EEOC, Mr. Cain presented NOPSI's affirmative action program. In addition to providing a copious numerical breakdown of the company according to employment, both minority and non-minority, Mr. Cain also explained by affidavit, the practical difficulties, and in some instances impossibilities, that would occur

if NOPSI were compelled to comply with the EEOC's production order.

To supply the information demanded by the Commission's subpoena would require NOPSI to undertake a mammoth research project; notwithstanding the sheer impossibility of furnishing certain information that simply is not in existence or is not available to the company, NOPSI would have to review countless employee personnel files, methodically examining each and every record in order to ascertain specific answers to the Commission's questionnaire. Among other labors, this research project would entail executing such a procedure for each employee for each of 950 job descriptions, with the accompanying processes of researching, collating, and reviewing the gathered information from the company's six main divisions and approximately thirteen sub-departments. Each of about 5,700 employment applications, for example, would have to be closely scrutinized and processed. NOPSI's Mr. Cain projected that the work needed to prepare answers to the Commission's inquiries would cost the company approximately $25,000 to $40,000, based on the work effort of thirty employees working a minimum of· 4,800 man-hours over a period of six months.

■ At the outset, the Court acknowledges the line of jurisprudence in this circuit, see, e. g., Burns v. Thiokol Chemical Corp., 483 F.2d 300 (5th Cir.

1973); H. Kessler & Co. v. EEOC, 472 F.2d 1147 (5th Cir. 1972); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972); Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968), as well as in other circuits, see, e. g., Motorola, Inc. v. McLain, supra; General Employment Enterprises, Inc. v. Equal Employment Opportunity Commission, 440 F.2d 783 (7th Cir. 1971); Blue Bell Boots, Inc. v. EEOC, 418 F.2d 355 (6th Cir. 1969) which affords the Commission a broad horizon of investigatory powers. However, these liberal powers allowing the Commission to investigate evidence relevant to a bona fide charge must not be confused with the periodically pursued but nonexistent right to ramble through a company's records purely in hope of discovering statutory violations.

The present controversy can be bifurcated into the following rhetorical headings: (1) Did Commissioner Brown, who made the commissioner's charge in this case, have reasonable cause to believe a violation of Title VII of the Civil Rights Act had occurred; and, (2) Could any of the individual charges filed against NOPSI, or a combination thereof, support the subpoena under attack.

■ Section 2000e–5 of Title 42, United States Code, is the enforcement provisions of the Civil Rights Act. Subparagraph (a) explains the manner of presenting alleged violations of the Act to the Commission.[1] In 1972, Congress

---

1. Section 2000e–5(a) reads as follows:

Whenever it is charged in writing under oath by a person claiming to be aggrieved, or a written charge has been filed by a member of the Commission where he has reasonable cause to believe a violation of this subchapter has occurred (and such charge sets forth the facts upon which it is based) that an employer, employment agency, or labor organization has engaged in an unlawful employment practice, the Commission shall furnish such employer, employment agency, or labor organization (hereinafter referred to as the "respondent") with a copy of such charge and shall make an investigation of such charge, provided that such charge shall not be made public by the Commission. If

the Commission shall determine, after such investigation, that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such endeavors may be made public by the Commission without the written consent of the parties, or used as evidence in a subsequent proceeding. Any officer or employee of the Commission, who shall make public in any manner whatever any information in violation of this subsection shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined

amended Title VII of the Civil Rights Act, which amendment to Section 2000e–5 imposed a new condition on a commissioner who issues a charge, to wit: the commissioner's charge must be in writing and "under oath".[2] Without doubt, this modification on the requisites, a charge under oath replacing a charge based on reasoned belief, for issuance of a commissioner's charge created a stricter burden.[3] The parties differ in their views as to whether the amending statute, Section 14 of Public Law 92–261, affects the commissioner's charge at issue, that is, whether the commissioner's charge must satisfy the oath or affirmation clause incorporated in the 1972 amendments. The amending statute provides that the amendments to Section 706 of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–5, are applicable to charges pending with the Commission on the date of enactment of the amendments.[4] In the present action, the

not more than $1,000 or imprisoned not more than one year.

Note that former subsection (a) was redesignated as subsection (b) and generally amended in 1972. See footnote 2 infra for the language of the amended subsection.

2. The amended statute, § 2000e–5(b) provides:

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the "respondent") within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections (c) and (d) of this section. If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both. The Commission shall make its determination of reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge or, where applicable under subsection (c) or (d) of this section, from the date upon which the Commission is authorized to take action with respect to the charge.

3. Bolstering this stricter burden produced by the charge under oath requirement of the amended Civil Rights Act is the concomitant requirement that the charge set forth the date, place, and circumstances of the alleged unlawful employment practices, 42 U.S.C. § 2000e–5(b) and (e), Title VII, Civil Rights Act, as amended in 1972.

As stated in a subsequent portion of this opinion, see footnote 4 infra, and accompanying text, completed processes of a charge that were valid under the 1964 Civil Rights Act remain valid under the 1972 amendments to the Act. Incompleted or inherently defective charges under the 1964 Civil Rights Act, whose completion or cure happens after the enactment of the 1972 amendments, naturally must be regulated by the Civil Rights Act, as amended in 1972. If the present commissioner's charge fits into the latter category, thereby requiring compliance with the standards enumerated in the 1972 amendments, then the commissioner's charge, as it stands now, would be patently deficient due to the commissioner's failure to specify the date, place, and circumstances of the contended violations, all as statutorily necessitated.

4. The enabling clause, Section 14 of the 1972 amendments, reads as follows:

The amendments made by this Act to Section 706 of the Civil Rights Act of 1964

commissioner's charge was filed (January 4, 1972) prior to the amendment of Title VII of the Civil Rights Act (March 24, 1972) and the charge was, of course, pending when the amendments were approved by the legislature. Do the 1972 amendments, therefore, affect the validity of Chairman Brown's charge in this action? The Court believes not. While portions of the amendments indeed may apply to this case, the Court cannot accept the proposition that the amendments should invalidate a proper charge that has been perfected procedurally. It is apparent that the enabling paragraph, Section 14 of the 1972 amendments, was intended to force compliance with the revised procedural processes on a charge only to the extent that the charge had not already undergone that specific process in accordance with the original 1964 Civil Rights Act. It is a general proposition that, while procedural statutes do apply to pending litigation, they have no retroactive effect upon any steps that may have been taken in the action before such statutes are passed; all things performed under the old law must stand. *See,* NLRB v. National Garment Co., 166 F.2d 233 (8th Cir.), cert. denied, 334 U.S. 845, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948); Belanger v. Great American Indemnity Co. of New York, 188 F.2d 196 (5th Cir. 1951); Untersinger v. United States, 181 F.2d 953 (2nd Cir. 1950). Following this line of jurisprudence in the present case, the commissioner's charge was completed and was filed before the enactment of the 1972 amendments, and it is not undone by the subsequent legislation. Thus, if, and only if, the filing was valid under the 1964 Civil Rights Act, it remained valid under the amended Act.

This last mentioned presupposition *concerning the validity of the commissioner's charge posits an important inquiry:* whether the commissioner had "reasonable cause to believe" that NOPSI was operating in violation of Title VII of the Civil Rights Act of 1964 at the time his charge was filed. The Court, therefore, must focus its attention on an evaluation of the bases used by Commissioner Brown in formulating his charge. The commissioner's charge alleges NOPSI employment discrimination against Negroes, Spanish surnamed Americans, Jews, and females on the basis of race, national origin, religion, and sex with respect to recruitment, hiring, job assignment, seniority, promotion and other work conditions. To bolster the accusation, the commissioner included in his charge a statistical analysis comparing, for instance, the percentage of NOPSI employees who are blacks, Spanish surnamed Americans, or females with the percentage of those in the respective grouping in the New Orleans area. Offering additional grounds on which to sustain a finding of reasonable cause, the Commission, in written memoranda, has referred the Court to a series of hearings on discrimination in the public utilities industry, which were presided over by then Chairman Brown, as either a new or supplementary basis to support Commissioner Brown's charge. Hearings Before the United States Equal Employment Opportunity Commission on Utilization of Minority and Women Workers in the Public Utilities Industry (1971), (hereinafter referred to as 1971 Hearings). *Cf.* Hearings Before the United States Equal Employment Opportunity Commission on Utilization of Minority and Women Workers in Certain Major Industries (1970).

The Commission advances the argument that a commissioner's charge against an employer need not specify acts of discriminatory behavior; rather, the EEOC asserts that it suffices if the commissioner charges the employer with patterns or practices of discrimination. Several appellate courts have adhered to this tenet that a general description is

---

shall be applicable with respect to charges pending with the Commissioner of the

date of enactment of this Act [March 24, 1972] and all charges filed thereafter.
Pub.L. No. 92–261, § 14 (Mar. 24, 1972).

sufficient to activate the discovery process and that the facts supporting a charge of discrimination filed by a commissioner need not be stated. *See* Mountain States T. & T. Co. v. EEOC, 466 F.2d 541 (10th Cir. 1972), *following*, Sparton Southwest, Inc. v. EEOC, 461 F.2d 1055 (10th Cir. 1972); Sheet Metal Workers' Internat'l Ass'n Local 104 v. EEOC, 439 F.2d 237 (9th Cir. 1971); General Employment Enterprises v. EEOC, 440 F.2d 783 (7th Cir. 1971). Albeit detailed evidence of discriminatory behavior is not required when a charge is issued, the courts cannot delete sua sponte the parenthetical language (set forth the facts) when reading § 2000e–5(a). Indeed, this Court cannot ignore the existence of such a qualifying clause applicable to a commissioner's charge, which proviso mandates that a commissioner's charge "set forth the facts upon which it is based." The purpose of this clause is self-evident: to afford the same degree of procedural safeguards, and basic fair play, as embodied in the Fifth Amendment's due process clause, to the employer and to the employee. It is a national tradition and a historical fact that procedural safeguards for the benefit of all litigants constitute some of the most vital protections against oppressions, including oppressions by those whose motives may be well above reproach. In the instant set of circumstances, the approach taken by the Commission smacks of blatantly violating the due process provisions vis-à-vis the employer. With the exception of the six complementary individual charges regarding racial discrimination, the commissioner's charge against NOPSI fails to state any facts supporting employment discrimination. The Court does not brush aside the fact that incorporated into the commissioner's charge is a series of statistical data that purportedly support the respective allegations of discrimination. Moreover, in the problem of discrimination, racial, religious, sex, or ethnic, statistics often reveal much, and courts generally listen. Alabama v. United States, 304 F.2d 583

(5th Cir.), aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed. 112 (1962). But the courts see, too. And it would border on near-sightedness for the Court not to acknowledge the broad generalities and the lack of correlation to significant factors, such as, applications, promotions, availability of trained or qualified personnel, all of which is fatally inherent in the statistics embodied in the commissioner's charge. These raw statistics reveal little.

While the *1971 Hearings* did allow several of the commissioners to ascertain the general employment policy of the public utilities industry, surely, it should not, and could not be contended by the Commission that the resultant opinions should apply carte blanche to each member of the industry. Yet, this is exactly the rationale that the Commission has embraced and submitted in support of its position. No representative from NOPSI appeared at these hearings, and no mention is made of NOPSI throughout the three days of hearings.

The language of Commissioner Brown's charge when compared to the majority of comments made by the EEOC commissioners during the *1971 Hearings* strongly suggests that the charging commissioner may have improperly parrotted the mood of these hearings rather than properly issued the specific charge. Illustrative of this approach is the commissioner's charge that NOPSI discriminates against Jews. During the *1971 Hearings* considerable attention was directed to the issue of discrimination against Jews in the public utilities industry. Ergo, a charge of discrimination against Jews by NOPSI is a mainstay of Commissioner Brown's charge, notwithstanding the lack of even a scintilla of evidence to indicate the existence of such discrimination.

In discussing the present set of circumstances, it should be noted that Congress has required that a commissioner shall have reasonable cause and shall set forth facts upon which he bases his charge of discrimination. By con-

gressional mandate, a commissioner's charge must meet this two-fold standard, since such conditions are inextricably intertwined with the due process that must be afforded to employer and employee alike. The Court does not question the good intentions frequently demonstrated by the Commission and its commissioners. But good intentions occasionally may exceed the pale of due process, and, as appreciated by Congress, it is at this point that the constitutional safeguards are so important. Due, in part, to the unfortunate overreaction of the commissioner, the facts of the instant case present such an illicit extension beyond the permissible boundaries of inquiry in two respects: First, the hyper-generalization by the commissioner to the effect that some employment discrimination in some of the public utility companies reveals that similar discrimination must pervade the entire industry, in particular, NOPSI, the instant company under scrutiny. Had, to pose a hypothet, the employer attempted to justify discrimination in hiring by arguing that the bulk of its employment practices are not discriminatory, though some are, or that other employers in the industry practice such discrimination, the Court, without hesitation, would have rejected such unacceptable positions. Yet, what is proper for the employee should follow a parallel line of proper treatment for the employer. It is axiomatic, therefore, that the Court evaluate each charge and each allegation of each employer on its own merits or lack thereof, rather than accept a handful of broad, presupposed principles intended to have universal application.

Though certain courts have approved of charges containing conclusory allegations of discrimination, *see*, Sparton Southwest, Inc. v. EEOC, *supra*, Local No. 104, Sheet Metal Workers, Internat'l, Ass'n v. EEOC, *supra*, to reach the result of permitting an investigation by the EEOC, their rationale must be principally predicated on circumvention of congressional intent requiring specifications of the facts.

■■ The second impropriety concerns the ballooning, by the Commission, of employee allegations of racial discrimination into employee charges of discrimination based on not only race, but sex, religion, and ethnic background. The Court realizes that, in certain circumstances, the Commission may issue charges or tailor relief which goes beyond the limited interests of the charging parties, *e. g.*, Blue Bell Boots, Inc. v. EEOC, *supra*, but such authority does not empower the Commission to convert, at its whim, individual charges into charges susceptible of exploring all types of potential discrimination regardless of the nexus to the original charge or charges. In its memorandum in support of its motion for summary judgment, the Commission candidly admits that the prospective answers to its subpoena will allow the Commission to determine whether there is reasonable cause to believe discrimination charges against NOPSI are sound. This backdoor approach by the Commission is strikingly apparent: the Commission hopes to find support from the subpoenaed materials that there is reasonable cause to believe NOPSI practices employment discrimination despite the statutory requisite that such a belief be present *prior* to filing a charge.

■■ The Court rejects the limitations on the subpoena which NOPSI proposes to impose with respect to the allegation of racial discrimination. NOPSI has offered to produce documents and data relevant to the six individual charges filed with the Commission, although this information would be limited dually to the alleged employment malpractice and the respective company department of each charging employee. It is reasonable to infer that one of the prime factors that caused this litigation is the extreme position adopted by each party: NOPSI's attempt to unduly minimize the scope of any investigation, and the Commission's attempt to unduly maximize the scope of its inquiries. Requesting the Commission to restrict its investigation of NOPSI to the com-

plaints in the individual charges, that is, to the particular practice and department would be illogical. The individual charges contain allegations that NOPSI discriminates against blacks in its hiring, placing, and firing practices. It is untenable to assume that other employment operations, such as recruitment, promotion and training, can be segregated from those practices alluded to in the charges. Similarly, it would be myopic to only investigate the NOPSI departments under attack; if any racial discrimination exists in one or more departments of a company, it is highly unlikely that racial discrimination does not pervade other departments. Blue Bell Boots, Inc. v. EEOC, *supra*; Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968). In the same breath, the Commission should not be free to manipulate the scope of a case beyond the related bounds and interests of the complainants' charges; EEOC v. New York Times Broadcasting Service, Inc., 364 F.Supp. 651 (W.D.Tenn.1973). The Commission's charge and subpoena extend well beyond the single issue of racial bias raised by the six individuals; the commissioner; though perhaps properly motivated, has attempted to plunge the Commission into an all-encompassing investigation of each and every form of discrimination that currently captivates public interest, despite the total lack of connexity to the individual charges of racial discrimination, and likewise, the Court rejects the expansive nature of the EEOC subpoena.

■ In addition to determining that the present subpoena is directed to areas wholly inapposite to the racial allegation, the Court believes that the subpoena is defective because it requires NOPSI to compile and assimilate data from its records. The Civil Rights Act does authorize the EEOC to copy information (42 U.S.C. § 2000e–8) and does require the employer to produce documentary evidence relevant to the charge under investigation (42 U.S.C. § 2000e–9); however, the Civil Rights Act does not impose upon the employer the assemblage of this gathered data. Kessler & Co. v. EEOC, 53 F.R.D. 330 (N.D.Ga.1971); Joslin Dry Goods v. EEOC, 336 F.Supp. 941 (D.Colo.1971), aff'd on this ground, 483 F.2d 178 (10th Cir. 1973). The extent that the subpoena in issue must be modified to meet with judicial approval shall be decided and executed by the Commission, as it would be inappropriate for the Court itself to revise this subpoena, though it should be relatively clear to the parties from this opinion what the suitable parameters of the modified subpoena would be.

As previously indicated, this Court does not allow procedural technicalities to impede the proper vindication of fundamental rights, particularly in civil rights cases. But the Court is equally mindful not to ignore certain statutory standards under the pretext that they can be classified as mere procedural niceties. For instance, the term "relevant" in Section 2000e–5(a) of the 1964 Civil Rights Act provides same needed limitation on the scope of an investigation by the EEOC, and, to denominate the word "relevant" as a procedural technicality for the sake of expediency, regardless of the value of the end result, would violate the meaning and spirit of the statute.

■ In short, it would be proper for the Commission to investigate any form of employment discrimination, whether race, sex, religion, or national origin if, and only if, the investigation is founded upon a properly filed charge by a commissioner. 42 U.S.C. § 2000e–5(a).[5] To file such a charge on January 4, 1972, a commissioner first must have had reasonable cause to believe that the discriminatory practice actually did exist, and further, the Commission must have presented a concise statement of facts on which the charge rested. If the Commission is presented with an individual's charge of employment discrimination, then the EEOC can, and should,

5. See footnote 1, *supra*.

investigate all employment grievances *relevant* to that person's charge.

 In the instant case, however, the Court finds that the Commission has utilized six individual charges of alleged racial discrimination as a springboard for initiating a company-wide inquiry into virtually every imaginable type of employment discrimination, when the facts, as the Court finds them, disclose no basis for a reasonable cause by the charging commissioner to believe that such other discriminatory practices actually did exist. Accordingly,

It is ordered that the Equal Employment Opportunity Commission is hereby enjoined from the enforcement of its subpoena duces tecum issued by the Commission on August 11, 1972, against New Orleans Public Service, Inc., and, is likewise enjoined from pursuing any investigation of the commissioner's charge issued in EEOC Case Number TNO–2–0692.

It is further ordered that the motion pursuant to Rule 81(a)(3) of the Federal Rules of Civil Procedure or alternatively for summary judgment filed by the Equal Employment Opportunity Commission against New Orleans Public Service, Inc. is hereby denied.

## APPENDIX A

In the matter of an investigation of New Orleans Public Service, Inc., 317 Baronne Street, New Orleans, Louisiana.

Request therefore having been made by the undersigned District Director YOU ARE HEREBY REQUIRED AND DIRECTED TO CAUSE TO APPEAR BEFORE (Name) George Hamilton Rice of the Equal Employment Opportunity Commission a representative or representatives knowledgeable with respect to the records inquired about herein at (Place) New Orleans Public Service on (Date) August 18, 1972 at (Time) 9:00 A.M. to produce and bring with you at said time and place documents and information pertaining to the following matters (unless otherwise specified, the records and information sought herein should cover the period subsequent to January 1, 1970):

A. *Recruitment:*

1. Recruitment policy statement.

2. Sources of recruitment (Specify names and addresses of schools, agencies, etc.).

3. Composition of recruitment teams (name, race, sex, religion, national origin, education and experience).

4. Types of positions recruited for.

5. Number of minority group members and females recruited and identification of source from which recruited.

B. *Hiring–placement:*

1. Copies of all documentation relating to interview procedures, techniques and/or regulations.

2. A written description of factors utilized to determine the initial job assignment of new hires.

3. Job or position descriptions for each job classification and all documentation relating to qualifications required for each job.

4. A list of each job group ranked from the lowest paid to the highest paid within each department or other similar organizational unit, including departmental or unit supervision. If there are separate work units or lines of progression within a department, a separate list should be provided for each such work unit, or line, including supervisors.

5. A listing showing the number of minorities and females hired and positions in which placed (hourly, salaried, clerical and managerial by name, job title, race, sex, national origin, pay rate, and seniority date, to include maiden name of all females).

6. A list of all employees (hourly, salaried, clerical and managerial) by department with name, job ti-

tle, race, sex, pay rate, seniority date.

7. The number of vacancies since January 1, 1970. Please list by department, job title and salary.

8. Copy of a blank application form.

9. Copy of all tests used in connection with hiring, promotion or transfer of employees and copies of all validation studies conducted with respect to each test.

10. Applications of all individuals not hired and a statement of the reasons for rejections.

11. Written policy on hiring.

C. *Promotion:*

1. A list of all persons promoted by name, sex, department, and copy of work history (to include maiden name of all females).

2. Copies of bids for all promotions submitted since January 1, 1971.

3. A description of Company's promotion and seniority system not otherwise described in a call.

4. A list of persons who applied for promotions, but who were rejected and reason for rejection.

5. Work records of persons rejected for promotion.

6. Copy of union contracts.

D. *Training:*

1. Written descriptions of all training programs.

2. Qualifications required for participation in each training program.

3. Names and work history records of persons participating in each training program by name, race, sex and religion.

4. Names and work history records of persons who requested training by race, sex, religion and national origin, but who were denied training.

E. *Terms and Conditions:*

1. A description of the type of seniority utilized for transfer and promotions in each department.

2. Overtime regulations.

3. A list of persons by name, race, sex, religion and national origin who received bonuses.

4. A description of the company's sick leave policy, including maternity leave.

F. *Union:*

1. A list of all grievances filed since July 1, 1970 and the disposition of each.

G. *Layoff, Retention and Recalls:*

1. A list of employees by race, sex, national origin on layoff status.

2. A list of all employees laid off or recalled from layoff and copies of the work records of all employees recalled.

3. A list of all employees terminated and their work records.