STATE OF NEBRASKA, APPELLEE, V. PATRICK RONALD RUS-
SELL, APPELLANT.

230 N. W. 2d 196

Filed June 5, 1975. No. 39656.

Frank B. Morrison and Bennett G. Hornstein, for appellant.

Paul L. Douglas, Attorney General and Ralph H. Gillan, for appellee.

Heard before SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

McCOWN, J.

The defendant, Patrick Ronald Russell, after trial by the court without a jury, was convicted of the crime of first degree murder and sentenced to life imprisonment.

On November 10, 1973, Joseph Matthew Edmonds, an 8-year-old boy, was reported missing in Omaha, Nebraska. A police investigation was started on the following day. On Tuesday, November 13, 1973, at approximately 3:30 p.m., the boy's body was found on the floor of a bedroom in a vacant apartment at 1619 California Street in Omaha, Nebraska. A length of telephone cord was around his neck and medical evidence established that death was caused by strangulation approximately 72 hours before the discovery of the body.

A coincidental chain of events led to the interrogation and implication of the defendant. At approximately 3 p.m. on the afternoon of November 13, the daughter of the owner of an automobile observed an individual attempting to break into her father's automobile in downtown Omaha. An officer of the Omaha police department was called and the defendant, a 17-year-old boy, was interrogated when he was located in a nearby store. The car owner declined to press charges for the break-in, and the police officer decided not to pursue the matter, but did make out an information report and

took note of the defendant's address. The officer also noted that the defendant appeared to be in a deranged mental condition, although he appeared to understand the officer's questions.

When the officer returned to central police station at about 4 p.m., he discovered that the body of the Edmonds boy had just been found and noticed that the address was close to the address he had just noted as the defendant's address. The officer's information report generated additional investigation of the defendant. Early that evening two officers of the police department went to the residence where the defendant lived with his mother and brother, and said they wanted to take the defendant to the police station to talk to him about the automobile break-in. The residence was in the same apartment complex where the boy's body had been found. There is some conflict in the evidence at this point, in that the police officer testified the defendant's mother was told that if she wanted to go to the station with the defendant she could, but that she declined. The defendant's mother stated that when she asked if she should come, the officers said that they would bring him right back. The defendant agreed to go with the officers. He was taken to the police station to the criminal investigation bureau. At that time he was given the Miranda warnings and a rights advisory form which he completed and signed. Officer Thompson then interrogated the defendant for a little more than an hour. That conversation was not recorded.

At approximately 8:20 p.m. a formal interrogation began. An Officer Miller again gave the defendant the full set of Miranda warnings from a rights advisory form and the defendant responded "yes" to all the waiver questions and signed the second rights advisory form. The questioning was conducted by Officer Miller and by the county attorney, and the interrogation was tape recorded and both the tapes and the transcript of them

are in the record. The interrogation continued for a little more than an hour until 9:37 p.m.

The defendant's statement was that he had met the Edmonds boy on two or three previous occasions when Edmonds had been playing with the defendant's younger brother. On Saturday, November 10, 1973, the defendant met the Edmonds boy and after some conversation the Edmonds boy accompanied him to a store to purchase some feed for a pet animal. They did some window shopping and looking around before the two returned to the apartment complex. They noticed that a basement apartment was open and they went into the apartment at about 2:30 p.m. There they found some coffee and donuts which they sat down and consumed. The defendant stated that the two engaged in some homosexual activities instigated by the Edmonds boy for a short time. After some extended conversation, the defendant said that the Edmonds boy called the defendant and defendant's grandmother names. This incensed the defendant. The defendant took a knife out of his pocket and cut the cord from a telephone in the apartment. He then told the boy to close his eyes and he slipped the cord around the boy's neck, jerked the cord, and kept the cord on the boy's neck until his face "got nice big bright red." At this point the defendant's statement was that he removed the cord from the boy's neck and the boy went from the kitchen to the bedroom gasping for breath and fell on the floor. The defendant also stated that he cut the telephone cord up and threw it on the floor; that the Edmonds boy pulled his own jacket over his face; but he also said that when he left the apartment, the Edmonds boy had a piece of telephone cord around his neck. The defendant stated that he thought the Edmonds boy died from the cord being pulled around his neck. He also said that before he left the apartment he attempted to wipe away his fingerprints and those of the Edmonds boy. He left the apart-

ment somewhere between 4 and 4:30 p.m. on November 10, and did not return to the apartment thereafter.

The pathologist who performed the autopsy testified that the twisted piece of telephone cord around the Edmonds boy's neck was very tight and that there was a ligature strangulation mark around the neck, with hemorrhages under the neck, and discoloration around the anterior surface of the neck. He testified the cause of death was asphyxia due to ligature strangulation around the neck.

Other witnesses and technicians testified as to numerous items of physical evidence. The telephone cord had been cut from the phone in the vacant apartment, and latent fingerprints of the defendant were found on the stove in the kitchen. There was also evidence that entrance to the vacant apartment had been gained through the back door using a coathanger.

Jury trial was waived and the parties stipulated that evidence on the defense plea in abatement and on the motion to suppress the defendant's statements could be adduced as part of the trial on the issue of guilt, with rulings reserved until the conclusion of trial. It is therefore appropriate to summarize the evidence dealing with the defendant's mental condition.

The defendant was 17 years of age on July 22, 1973. He had been a psychiatric patient for the first time at age 14 because of his withdrawn behavior, and was hospitalized for treatment for approximately a month. One of his doctors recommended the Omaha Home for Boys, and the defendant resided there for about 2 years, returning to live with his mother in July 1973. In August 1973, an assistant public defender was appointed by the juvenile court to represent the defendant on three assault and battery charges. All three charges involved sexual attacks on young boys ranging from 4 to 8 years of age. Pursuant to a plea bargain, two charges were dismissed and an admission made by the defendant to the third charge. On October 30, 1973, the

defendant was placed on probation on the third count contingent on his being accepted into the Job Corps.

Psychological tests administered by psychologists reflected substantially consistent results. Prosecution psychological tests showed a full scale I.Q. of 95 and a performance I.Q. of 108. The defense psychologist recorded a full scale I.Q. of 88 and a performance I.Q. also approximately 10 points lower than that of the prosecution tests. The psychologists agreed that the defendant was dull normal or low average, and that he was not mentally retarded.

Two psychiatrists testified for the prosecution. Both had examined the defendant under court order. They concluded that the defendant was not legally insane and did not suffer from any major mental illness or psychiatric disorder of either moderate or severe degree. Both concluded that the defendant was able to comprehend Miranda rights questions and did not believe that the defendant's ability to intelligently waive his rights was impaired. An experienced and qualified psychiatrist for the defense, on the other hand, testified that the defendant was mentally deficient and a chronic schizophrenic. In his opinion, the defendant was legally insane at the time of the alleged homicide. He also doubted the defendant's ability to knowingly and intelligently waive his rights under the rights advisory form.

The District Court, after trial, denied the defendant's plea in abatement; overruled the motion to suppress the defendant's statements; found that the defendant knowingly and intelligently waived his rights; and that the statements of the defendant were freely and voluntarily made. The trial court determined that the State had proved the defendant's sanity beyond a reasonable doubt; found him guilty of murder in the first degree; and imposed a sentence of life imprisonment.

A basic foundational issue in this case involves the defendant's contentions that he was insane and therefore not responsible for his acts, nor capable of waiving

his constitutional rights. In this state the test of responsibility for crime is the defendant's capacity to understand the nature of the act alleged to be criminal and the ability to distinguish between right and wrong with respect to the act. State v. Jacobs, 190 Neb. 4, 205 N. W. 2d 662.

A defendant in a criminal action is presumed sane until evidence of insanity is produced. The State then has the burden of proving beyond a reasonable doubt that the defendant was sane at the time the crime was committed. In this case the evidence as to sanity and mental condition was in direct conflict. Testimony of the expert witnesses was in many respects contradictory. The testimony of other witnesses as to the defendant's appearance and conduct, both before and after the actual time of the murder, gave the court, sitting as a jury, the opportunity to relate that testimony to the experts' testimony that was given in this case. The question of whether the legal sanity of the accused has been established beyond a reasonable doubt at trial is one of fact to be determined by the trial court when a jury has been waived. Where there is substantial evidence to sustain the finding of the trial court on that issue, that determination will not be disturbed on appeal. State v. Klatt, 187 Neb. 274, 188 N. W. 2d 821. The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support the findings. State v. Newson, 183 Neb. 750, 164 N. W. 2d 211.

The major thrust of defendant's attack upon the conviction here is directed at the failure to suppress the incriminating statement made by the defendant. Defendant contends that trickery was used in taking him to the police station; that he was a juvenile less than 18 years of age, and was mentally incapable of understanding the advisory rights warnings and of waiving his constitutional rights; and that the statements were taken in the absence of his counsel and his mother.

Therefore it is argued that the totality of the circumstances demonstrates the defendant did not knowingly and intelligently waive his privilege against self-incrimination and his right to retained or appointed counsel; and that his statements were therefore involuntary and should have been suppressed.

The record here is undisputed that the in-custody interrogation of the defendant fully complied with the procedures laid down in Miranda. Under such circumstances appellate courts should be slow to mandate additional responsibilities. See United States v. Poole, 495 F. 2d 115 (D. C. Cir., 1974). The record of the interrogation, reinforced by the tapes, is devoid of any indication of coercion unless it can be said that custodial surroundings in themselves constitute coercion. If the defendant's contentions were to be accepted, it would be impossible for a 17-year-old boy with any history of mental illness to waive his constitutional rights or to make a voluntary statement which would be admissible at trial. We find no acceptable basis upon which to reach such a conclusion. The time required for the interrogation was comparatively short and it was conducted in the early evening hours. The evidentiary use of a defendant's incriminating statement violates due process if it can be shown that the statement obtained is not the product of a rational intellect and a free will. The determination of those issues necessitates the consideration of the totality of the circumstances. Davis v. North Carolina, 384 U. S. 737, 86 S. Ct. 1761, 16 L. Ed. 2d 895. In cases involving related or analogous circumstances courts have found that the totality of circumstances supported the conclusion that the statements made were voluntary. See, United States v. Poole, *supra*; United States v. Singleton, 361 F. Supp. 346 (1973); United States ex rel. Brown v. Rundle, 450 F. 2d 517 (3d Cir., 1971); United States ex rel. Rush v. Ziegele, 474 F. 2d 1356 (3d Cir., 1973); Commonwealth v. Cannon, 453 Pa. 389, 309 A. 2d 384 (1973); Schade v. State, 512 P. 2d 907

(Alas., 1973). A confession or statement cannot be held invalid merely because the accused was 17 years of age nor merely because he had a history of intermittent mental illness. In the case before us the totality of the circumstances supports the conclusion of the trial court that the defendant's statement here was given voluntarily, knowingly, and intelligently, and was not constitutionally defective.

In a secondary attack on the admissibility of the defendant's statement, it is contended that section 29-1804.03, R. S. Supp., 1974, which places the duty on the public defender to represent all indigent persons charged with, or under arrest for, criminal offenses makes the public defender the counsel for the defendant in this case at the time the defendant was interrogated. It is also contended that because an assistant public defender was still acting as counsel for the defendant in a separate juvenile offense, the public defender therefore was also counsel for the defendant in this case at the time the critical interrogation took place.

It seems obvious that general duties imposed on a public defender by statute do not automatically make him counsel for any individual in a criminal proceeding until appointment to represent a specific individual in a particular criminal proceeding has been made by a judicial officer. It is equally clear that the appointment of counsel in a specific criminal or juvenile proceeding does not operate as a continuing or automatic appointment to act as counsel in any other separate criminal or juvenile proceeding which may thereafter be commenced against the same defendant. The provisions of DR 7-104 relied on by the defendant only prohibit lawyers from communication with a party known to be represented by a lawyer *in that matter*. That rule does not prohibit communication by a county attorney with a defendant in a criminal case simply because that defendant is known to be represented by counsel in some other matter. The defendant's contentions with respect

to representation by counsel are entirely unsupported.

Finally, by a plea in abatement, the defendant challenges the jurisdiction of the District Court by asserting that the defendant was entitled to the benefits of sections 43-202.01 and 43-202.02, R. S. Supp., 1974. Those procedural statutes deal with specific standards to be followed by a county attorney in determining whether to file criminal charges against a minor in juvenile court or in adult court. The sections did not become effective until some two months after the defendant's trial, but the defendant claims the benefit of such statutes upon the theory that the benefits of the statutes should be granted as though they constituted a statutory mitigation of punishment for murder. The defendant relies upon State v. Randolph, 186 Neb. 297, 183 N. W. 2d 225. Obviously the amendatory statutes here do not serve to mitigate the sentence imposed. They are simply procedural. The prior procedures followed in this case were specifically approved by a majority of this court in State v. Grayer, 191 Neb. 523, 215 N. W. 2d 859. While procedural statutes do apply to pending litigation, it is a general proposition of law that they have no retroactive effect upon any steps that may have been taken in an action before such statutes were effective. All things performed and completed under the old law must stand. See New Orleans Public Service, Inc. v. Brown, 369 F. Supp. 702. Here the entire trial had already been completed in the District Court before the amendatory procedural act became effective. Defendant's plea in abatement was properly denied.

The defendant's remaining assertions of error are without merit. The judgment of the District Court is affirmed.

AFFIRMED.