STATE OF NEBRASKA, APPELLEE, v. JOSEPH MCDONALD,
APPELLANT.
240 N. W. 2d 8

Filed March 25, 1976. No. 40179.

Paul E. Watts, J. Joseph McQuillan, Gerald E. Moran, and Robert C. Sigler, for appellant.

Paul L. Douglas, Attorney General, and Bernard L. Packett, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

McCOWN, J.

The defendant, Joseph McDonald, was charged with

killing Lyle Duane Ford in the perpetration of a robbery. That offense is first degree murder under section 28-401, R. S. Supp., 1974. He was found guilty by a jury and sentenced to life imprisonment.

At approximately 3 a.m., on the morning of July 4, 1974, a police officer observed an automobile on fire in a trailer court at 19th and Read Streets in Omaha, Nebraska, and immediately placed a fire alarm. The Omaha fire department arrived some 5 minutes after the alarm was received, broke out all the windows of the car, and extinguished the flames. Following routine procedure, they opened the hood and the trunk of the burned car. The body of Lyle Ford was found in the trunk. There was a wound behind the left ear and streaks of blood on the neck and face.

Two officers of the Omaha police department began an immediate investigation by canvassing the area for witnesses. Several people residing in the trailer court provided information. Three witnesses had seen and heard two boys arguing with a man in the immediate area of the burned car sometime before the fire. One witness said the boys appeared to be trying to get money from the man. One witness said that one of the boys had on a light T-shirt. Another said that one of the boys had on a gold T-shirt and had long blonde hair, and the other boy was of "slighter" stature, possibly younger, and wore dark clothing. Another witness also said one boy had long blonde hair and was wearing a gold T-shirt. The manager of the trailer court advised one of the officers that a younger brother of an occupant of one of the trailers had been involved in another fire recently. The officers then went to the trailer occupied by the defendant's brother, Tim McDonald, and talked with him. Tim said that Joe McDonald, the defendant, had been at the trailer at about 10:30 p.m. At that time, he had on a gold T-shirt and he had long blonde hair. The police officers also learned from witnesses that the defendant had been with a boy named

Robert Johnson earlier in the evening, and that Johnson was of slighter stature and lived in the trailer court. This led the officers to the Johnson trailer. The officers knocked on the door and were admitted by Robert Johnson's mother. The officers asked if the defendant and Robert Johnson were there. She stated that they were in the living room sleeping. She let the officers in and they observed the defendant sleeping on the floor and Johnson sleeping on a couch. The officers awoke the boys and told them they wanted to talk to them. The boys got up and dressed. The defendant, who had long blonde hair, put on a yellow T-shirt and a pair of trousers. The officers noticed what appeared to be blood on the T-shirt and trousers. Johnson's physical appearance and clothing also matched the descriptions given to the officers. The officers then arrested both boys at approximately 6 a.m. and took them to the police station.

The medical evidence was that the victim was still alive at the time of the fire, and that he died from asphyxiation. The doctor also testified that it was possible that the victim could have died from the head wound but the fire intervened and killed him before that happened.

The evidence was conflicting as to the cause of the fire. The prosecution presented evidence tending to show that the fire had been set. The defense introduced evidence tending to show that the fire was accidental and caused by dropping a match or cigarette on the carpet, or by a short in the cigarette lighter.

At the time of the crime, the defendant, Joseph McDonald, was 16 years old, and Robert Johnson was 15 years old. Both of them testified at trial, Johnson as a prosecution witness, and the defendant on his own behalf.

In general outline, the testimony of the two boys substantially agreed. On July 3, 1974, the two boys were part of a group of girls and boys who spent the evening

drinking beer and riding around the city. They returned to the trailer park sometime after midnight. At approximately 1:45 a.m., the girls left in the car in which the group had been riding. At that time the boys were at least partially intoxicated.

The boys saw the victim, Lyle Ford, in his car in the trailer park even before the girls left. He appeared to be drunk and was having trouble lighting a cigarette. After the defendant had an additional beer, he and Johnson had a brief argument with the victim and attempted to get some money from him on the pretext that he had backed into the car of the defendant's brother, but they were unsuccessful.

From this point on the testimony of the two boys, McDonald and Johnson, is in substantial agreement as to what they did together but is sharply divergent and conflicting as to which one suggested or performed certain acts. The boys went to the Johnson trailer, got a shotgun, broke it down, took the shotgun barrel, and went back to the victim's car. The victim was standing behind his car and the trunk was open.

Johnson testified that the defendant hit the victim on the head with the gun barrel, the victim fell into the trunk, and Johnson helped put the rest of the victim's body into the trunk. He testified that the defendant suggested robbing the victim, and that the defendant took the victim's wallet before they closed the trunk lid. He also testified that the defendant deliberately set the car on fire afterward. The defendant testified that Johnson hit the victim and the defendant helped put the victim's body into the trunk. The defendant testified that he did not know Johnson was going to rob the victim until afterward when Johnson gave him $20 from the victim's billfold, and then threw the billfold away. The defendant also testified that Johnson got into the car afterward and used the cigarette lighter to light a cigarette. The defendant did not see Johnson set the car

on fire, but testified that he, the defendant, did not set it on fire.

When the boys left the victim's car, they returned to the Johnson trailer, put the shotgun back together, and left it there. They then went to another trailer to get a crowbar with which to open the trunk, but the woman would not let them in. As they were returning to the Johnson trailer, they could see the victim's car burning. They went into the Johnson trailer, watched the activity around the fire for awhile, and then went to sleep. The shotgun, the victim's wallet, and money taken from defendant's person were all received in evidence.

The jury found the defendant guilty and he was sentenced to life imprisonment.

The defendant first contends that there was no probable cause for his warrantless arrest, and that all evidence obtained thereafter was the fruit of an unlawful and unconstitutional arrest and should have been suppressed.

In Nebraska, as in most other states, a police officer may arrest without a warrant when it appears that a felony has been committed and there are reasonable grounds to believe that the person arrested is guilty of the offense. State v. Russ, 193 Neb. 308, 226 N. W. 2d 775. As this court said in State v. Irwin, 191 Neb. 169, 214 N. W. 2d 595: "Probable cause justifying an arrest without warrant exists if the facts and circumstances known to the arresting officer warrant a prudent man in believing the offense has been committed and that the defendant committed it." See, also, Beck v. Ohio, 379 U. S. 89, 85 S. Ct. 223, 13 L. Ed. 2d 142. As the Supreme Court phrased it, the test of probable cause for a warrantless arrest is "* * * whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."

The rule of probable cause is a practical rather than a technical concept. In the case at bar, the arresting officers knew that a crime, or crimes, had been committed. The officers had seen the body of the victim and had also examined the burned car and the surrounding area. They had talked to numerous witnesses and knew that the victim had been arguing with two boys about money shortly before the victim's car burned. They had reasonably accurate physical descriptions of the two boys, as well as descriptions of their clothing. After some 2 or 3 hours of investigation, they found two boys asleep in a trailer near the scene of the crime who fit the physical descriptions. When the boys were awakened, they put on clothing matching the descriptions given to the officers. The defendant's clothing appeared to have blood on it and the officers knew about the cut and the blood on the head of the victim. The facts and circumstances known to the officers at the moment of arrest were clearly sufficient to constitute probable cause justifying the arrest.

The defendant next contends that the statements obtained from the defendant on the evening of July 4, 1974, and the morning of July 5, 1974, were involuntary, and were made without a knowing and intelligent waiver of the privilege against self-incrimination.

This issue requires an examination of the occurrences following the arrest of the defendant. The defendant arrived at the police station at about 6:30 a.m. on July 4, 1974. One of the arresting officers attempted to interrogate the defendant and advised him of his Miranda rights. The defendant understood the rights questions and answered them affirmatively until the officer's inquiry as to whether he would make a statement to him without a lawyer and he said "no." At that time the officer ceased the interrogation.

At about 9:30 a.m., the defendant was brought into an interrogation room with two officers and a representative of the county attorney's office present. The

officers knew that defendant was 16 years old and that he had been drinking the night before. They were also of the opinion that he was somewhat subpar mentally. The defendant was sobbing, generally incoherent, and complaining of chest pains. The officers determined that the defendant was in no condition to give a statement then and one of the officers remained with him in an effort to calm him down.

At approximately 10:15 a.m., the defendant's father was called by telephone and stated that he would come down to the station. At about 11:30 a.m., the officer who had remained with the defendant reported that he thought the defendant could be interrogated. The officers returned to the interrogation room, and informed the defendant of his Miranda rights. The defendant answered "yes" to all the rights advisory form questions, and signed the waiver form. The defendant's father had not yet arrived and although the defendant was calmer than before, he was still in some physical distress. A comparatively short statement was given and taped. The statement charged Johnson with striking and robbing the victim, and was essentially the same as the defendant's later testimony at trial, which has already been set out. At the time of the 11:30 a.m., statement, there is no evidence that the defendant had been allowed to call an attorney or that anyone had attempted to call an attorney on his behalf. The defendant's father did not arrive until shortly after the 11:30 a.m., statement had been taken.

The defendant's father advised him to tell the officers what happened, as far as he knew. He also persuaded him to go to the hospital because of the chest pains he was complaining of. The defendant was taken to the hospital. He was examined and X-rayed. The diagnosis was acute anxiety. Ten milligrams of valium were prescribed and administered at 2:20 p.m., with a notation of good relief by 3 p.m. He was released from the hospital at 3:20 p.m., and returned to jail.

There is no specific evidence of what the defendant did thereafter until approximately 10 p.m., that night. Neither the defendant nor his father apparently made any attempt to contact a lawyer. Dispositional hearings in three separate juvenile proceedings against the defendant had previously been set for hearing on the next day, July 5, 1974, and the defendant was represented by retained counsel in those matters.

At 8 p.m., on July 4, 1974, police officers interrogated Robert Johnson and taped a statement from him. Thereafter Officer London was assigned to conduct an interview with the defendant and run a polygraph test on him. The defendant was taken to the polygraph examination room at approximately 10 p.m., and advised of his rights. The defendant signed a waiver on the rights advisory form. Officer London obtained an oral statement which was not taped or transcribed. The officer's testimony indicates that the defendant's statement obtained at this time differed from the statement taken from him that morning in that the defendant said that he and Johnson talked about getting beer out of the car trunk of the victim, and that the defendant rather than Johnson hit the victim with the shotgun barrel and took the billfold. The defendant also conceded it was possible he had started the fire. This interview ended at approximately midnight.

On the morning of July 5, 1974, at approximately 8 a.m., the defendant was again interrogated after once more being advised of his rights and signing the waiver on the rights advisory form. This statement was taped. The defendant stated at one point that he could not remember whether he hit the victim or Johnson did. He stated that "the deal was to get the beer out of his trunk." He also said that Johnson had taken the billfold from the victim, and that the only way the fire could have started was when Johnson lit his cigarette. In later questioning, the defendant, when asked

who actually hit the victim, said "I don't know. I think I did. I don't know for sure if I did or not."

The hearing on the motion to suppress established, in addition to the facts previously noted, that the defendant had an I.Q. of 83, and was classified as low-average or borderline retarded. Following the hearing on the motion to suppress all three statements, the trial court found that the statement taken at 11:30 a.m., July 4, 1974, was involuntarily made. The trial court found that the defendant had not been afforded his right to counsel as to that statement, and that his mental and physical condition at the time of the statement were such that he did not voluntarily, intelligently, and understandingly waive his constitutional rights in making it. Although the statement was suppressed, the defendant later introduced it in evidence at the trial as a deliberate choice of strategy.

The trial court concluded that from noon until 10 p.m., on July 4, 1974, every opportunity was present for the defendant and his father to have contacted an attorney, and that the defendant already had an attorney representing him in connection with three juvenile matters which were scheduled for hearing the next day. The court also determined that the defendant had been through Miranda rights interrogations before in connection with those juvenile matters and had exercised his rights in varying fashion on each of those occasions. The court found that the defendant understood the questions here and knew and understood what was going on. The court determined that the defendant's physical condition at 10 p.m., July 4 and the morning of July 5, 1974, did not interfere with his ability to comprehend questions and give responsive answers. The court therefore found that the defendant voluntarily, understandingly, and intelligently waived his constitutional rights at the time he made his statement at 10 o'clock on the evening of July 4 and on the following morning. The court therefore permitted those statements to be admit-

ted in evidence, subject to the jury's ultimate determination as to whether or not they were made freely, voluntarily, and intelligently, and whether the requisite Miranda warnings had been given.

Although Miranda might be construed to bar any further questioning of a defendant after he had said he wanted a lawyer until such time as an attorney is present, that conclusion does not necessarily follow. In Michigan v. Mosley, 423 U. S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313, the Supreme Court determined that under Miranda, the invocation of the privilege against self-incrimination was not a "per se proscription of indefinite duration." The Supreme Court said: "We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.' "

In the case at bar the defendant contends that where the first statement was ruled involuntary, the later statements must necessarily be suppressed also. We disagree where a 10-hour time interval intervened between the two statements, during which the defendant or his father, or both, had time and opportunity to consult with counsel but did not do so. Where the defendant already had counsel retained in the juvenile matters set for the next morning, the failure to exercise the right and opportunity to consult with counsel after requesting it, ought not to invalidate all statements made thereafter. We believe the evidence sufficiently establishes the insulation of the first statement from those which followed to comply with Miranda.

In cases such as this the basic issue is whether or not the totality of the circumstances demonstrates the voluntariness or involuntariness of the statements. In Schneckloth v. Bustamonte, 412 U. S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854, the Supreme Court said: "This Court's decisions reflect a frank recognition that the Constitution requires the sacrifice of neither security nor liberty.

The Due Process Clause does not mandate that the police forgo all questioning, or that they be given carte blanche to extract what they can from a suspect."

The record of the interrogations, reinforced by the tape of the third statement, is devoid of any indication of coercion unless it can be said that custodial surroundings in themselves constitute coercion. While the defendant's age and mentality are appropriate factors to consider in weighing the totality of the circumstances, so is the defendant's previous experience with police interrogation in custodial surroundings. If the defendant's contentions were to be accepted, it would be practically impossible for a 16-year-old boy with an I.Q. of 83 to waive his constitutional rights or to make a voluntary statement which would be admissible at trial. To be admissible, a statement or confession must be free and voluntary. It must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. Brady v. United States, 397 U. S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747; State v. McDonald, 187 Neb. 752, 194 N. W. 2d 183. The determination of whether a statement was voluntarily made necessarily turns on the consideration of the totality of the circumstances in any particular case. Schneckloth v. Bustamonte, *supra*.

The evidentiary use of a defendant's incriminating statement violates due process if it can be shown that the statement obtained is not the product of a rational intellect and a free will. State v. Russell, 194 Neb. 64, 230 N. W. 2d 196. In the case before us, the totality of the circumstances supports the conclusion of the trial court that the defendant's statements on the evening of July 4 and the morning of July 5, 1974, were given voluntarily, knowingly, and intelligently, and were not constitutionally defective. See State v. Russell, *supra*. A finding of the trial court that a statement of an accused is voluntary will not ordinarily be set aside on ap-

peal unless the finding is clearly erroneous. State v. Medina, 189 Neb. 765, 204 N. W. 2d 785.

The defendant also contends that the trial court erred in refusing to instruct the jury that manslaughter was a lesser included offense in a charge of felony murder. The defendant argues that under his theory of the case and his testimony that he had no knowledge that Johnson intended to rob the victim, the refusal to instruct upon a lesser included offense after request constituted error.

In answer to the same contention in a felony murder case, this court said: " 'An information charging defendant with a homicide committed in the perpetration of or attempt to perpetrate a robbery, * * * charges only murder in the first degree, and it is error for the trial court to instruct the jury that they may find defendant guilty of murder in the first degree, guilty of murder in the second degree, or guilty of manslaughter.' " State v. Montgomery, 191 Neb. 470, 215 N. W. 2d 881.

The defendant contends that the Montgomery case acknowledges that there might be a set of facts under which an instruction on lesser included offenses might be appropriate. However, the exceptional situation referred to in that case was one in which there was a time lag between an assault, clearly complete, which results in death, and the robbery; where the robbery was clearly an afterthought, and the assault itself was not the direct means of perpetrating the robbery. Those circumstances simply do not appear here. All that must be proved on a felony murder charge is that a death occurred in the perpetration of one of the specific felonies listed in section 28-401, R. S. Supp., 1974. If those facts are not proven, the defendant is not guilty. Second degree murder or manslaughter are included within a regular charge of first degree murder because the mental state of the defendant determines the degree of the crime. In a felony murder case, the proof of a particu-

lar mental state is not required as to the killing. See Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151. Where an information charges a defendant with a killing committed in the perpetration of a robbery, it is ordinarily error for the trial court to instruct the jury that it may find the defendant guilty of manslaughter, even though such an instruction is requested.

The defendant contends in his brief that the defendant was denied due process because there was no compliance with the provisions of juvenile statutes applicable to taking juveniles into custody. The issue was not raised in the motion for a new trial nor presented to the trial court. Under such circumstances it will not be considered here.

The judgment is affirmed.

AFFIRMED.