**Joseph McDONALD, Plaintiff,**

v.

**Charles BLACK, Defendant.**

No. CV83-L-649.

United States District Court,
D. Nebraska.

June 13, 1986.

Mary C. Wickenkamp and R.P. Cathcart of Erickson & Sederstrom, P.C., Lincoln, Neb., for plaintiff.

Mark D. Starr, Asst. Atty. Gen., Lincoln, Neb., for defendant.

## MEMORANDUM ON REPORT AND RECOMMENDATION OF MAGISTRATE

URBOM, District Judge.

On August 22, 1985, the magistrate recommended, by filing 27, that the petition for habeas corpus be dismissed for failure to state a claim cognizable under 28 U.S.C. § 2254. A general objection was filed by his counsel on the ground that the recommendation was clearly erroneous and contrary to law.

I have reviewed the report and recommendation and find it to be entirely in order. The magistrate painstakingly studied and evaluated the various claims made by the petitioner and accurately assessed those claims in light of the constitutional law that was and is applicable.

The petition for a writ of habeas corpus must be denied.

## MAGISTRATE'S REPORT AND RECOMMENDATION

DAVID L. PIESTER, United States Magistrate.

The parties in this habeas matter have briefed the merits of the petitioner's claims and the matter is ready for my consideration. As grounds for habeas relief, the petitioner claims that violations of state statutes on the custodial treatment of juveniles resulted in a deprivation of procedural due process, that two of his statements were taken in violation of his right to be free from self-incrimination, that a violation of a state statute regarding juvenile court transfer of his case denied him procedural due process, and that he was denied the effective assistance of counsel.

### I

█ The petitioner's first claim alleges a denial of procedural due process rights by virtue of the state's failure to comply with certain statutory provisions regarding custody of juveniles. He claims that the Omaha police violated Neb.Rev.Stat. §§ 43–205.-01 and 43–205.02 (Reissue 1978)[1] by the

---

1. Similar provisions were reenacted in 1981 as § 43–248, 249, and 250 (Reissue 1984).

failure to contact the petitioner's father until ten hours after he was taken into custody, the failure to promptly take the petitioner before a juvenile court officer, and, as exclusively argued in the brief, the failure to provide the petitioner's father with a written explanation of the reasons for taking the petitioner into custody.

Section 43–205.01 enumerates four situations in which officers may take juveniles into custody without a warrant or court order. One such situation, which could apply to the petitioner's case, is when a felony has been committed and the officer has reasonable grounds to believe such child committed it. Section 43–205.02 provides steps to be taken by the officer who has taken custody of a juvenile under the preceding section. First, the officer shall immediately take reasonable measures to notify the juvenile's parent. Second, the officer has three alternatives including 1) release of the juvenile, 2) preparation of written notice requiring the juvenile to appear before the juvenile court at a specified time and stating concisely the reasons for his custody to be signed by the juvenile or parent whereupon the juvenile would be released, or 3) take the juvenile without unnecessary delay before the juvenile court or probation officer to deliver custody to the court or officer. The officer is directed to choose the alternative which is least restrictive of the juvenile and is compatible with the best interests of the juvenile and the community.

The petitioner does not allege a factual basis for the claimed violation of § 43–205.-01. The legality of the petitioner's initial custody is not challenged here and indeed was decided against the petitioner at trial and on appeal, the state courts finding that probable cause existed for his warrantless arrest. He does, however, allege violations of both the notice and disposition steps of § 43–205.02 in that his father was not contacted until ten hours after his arrest, and that in lieu of his release under the disposi-

tional step, law enforcement officials failed either to provide a written explanation of the reasons for his custody to his father or to deliver custody to a juvenile court officer. He emphasizes that, had his father been provided with a concise statement of the charges by the county attorney, his father would not have advised him to make a statement.

The respondent argues that the cited statutes are not applicable to the petitioner's situation, and that the alleged violations are irrelevant to the propriety of the petitioner's arrest and subsequent custodial treatment.

I need not address the applicability of the statute or whether it was in fact violated [2] to determine the constitutional merit of this claim. In order to be cognizable in a federal habeas action, the claimed procedural due process violation must be of federal constitutional magnitude. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Although a sovereign's departure from self-imposed rules of conduct may itself constitute a denial of procedural due process in military habeas corpus proceedings, *Myers v. Parkinson*, 398 F.Supp. 727 (E.D.Wis.1975) (cited in petitioner's brief), in federal habeas actions under § 2254, claims based solely on violations of state law are not properly considered. *Wallace v. Turner*, 695 F.2d 545 (11th Cir. 1983) (violation of state procedural rules for taking guilty plea does not itself raise constitutional question). *Williams v. Estelle*, 681 F.2d 946 (5th Cir.1982), *cert. denied* 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984) (that guilty plea was received in violation of state criminal procedure is not, itself, cognizable in habeas); *Rowe v. Grizzard*, 591 F.Supp. 389, 400 (E.D.Va.1984) (irregularities in state arrest procedures not of constitutional magnitude). Such state law violations do not implicate procedural due process rights unless they affect the knowing and voluntary

---

**2.** Although it is not clear that these violations are precisely those alleged in support of the petitioner's motion to suppress, the trial court relied in part on the violation of the statutory parental notice requirement in suppressing the

first statement, but found no constitutional or statutory violation in the circumstances of the two statements challenged here. Supplement 21 [Bill of Exceptions at 5–6, 9].

character of a waiver of other constitutional rights. *See e.g. Fair v. Zant,* 715 F.2d 1519, 1521 (11th Cir.1983) (guilty plea found involuntary where state law was reinterpreted frustrating defendant's reliance on withdrawal provision.) Furthermore, a successful procedural due process claim must allege prejudice resulting from the constitutional deprivation occasioned by the breach of state law. *Shigemura v. United States,* 726 F.2d 380 (8th Cir.1984) (violation of statutory extradition procedure); *Butler v. United States Parole Commission,* 570 F.Supp. 67 (M.D.Pa.1983) (non-compliance with state parole statute).

At the time of the petitioner's arrest and interrogation in 1974, the constitutional rights of juveniles in his situation were governed by the United States Supreme Court pronouncements in *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), and *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), both recognizing the special caution required with respect to rights waivers by juveniles because of their age and vulnerability, but neither specifying what procedural safeguards would properly implement such protection. *Gault* made it clear that juveniles enjoy the same Fifth Amendment rights as adults and are entitled at least to the same procedural due process protections. The process required in *Gault,* which involved a juvenile court delinquency petition, was written notice to the juvenile's parents specifying the charge of factual allegations to be confronted at the delinquency hearing. Where the failure to notify the parents impairs a juvenile's ability to prepare for a hearing, his procedural due process rights may have been violated. *United States v. Doe,* 701 F.2d 819, 822 (9th Cir. 1983). However, *Gault* cannot be taken to have established a due process right to the written notification of the juvenile's parents in all situations. Juveniles may be accorded procedural protections by state law beyond that constitutionally required. *See, People v. Saiz,* 620 P.2d 15 (Colo. 1980); *Lewis v. State,* 259 Ind. 431, 288

N.E.2d 138 (1972) (right to consult with parents pre-waiver). Indeed, the basis for the petitioner's claim is that the provisions of § 43–205.02 constitute procedural protection beyond the *Miranda* advisory for juveniles in custody, the violation of which has deprived him of due process. While, as *Gault* suggests, due process may dictate such additional procedural safeguards as prophylactic measures to ensure that the juvenile's basic rights are not violated, such procedural safeguards do not become constitutional rights in themselves. *United States v. Watts,* 513 F.2d 5, 8 (10th Cir.1975). Failure to notify parents of juvenile does not invalidate delinquency adjudication when due process has not, in fact, been denied.

A procedural due process claim based on a parental notice provision of the Florida juvenile code was rejected as a ground for federal habeas relief because the court considered the alleged violation a matter of state law, lacking any federal constitutional implications. *Holloway v. Wainwright,* 451 F.2d 149, 151 (5th Cir.1971) (statute required that the parents of a minor charged with an offense must be given due notice of the charges prior to the trial thereof). *See, Adams v. Wainwright,* 445 F.2d 832 (5th Cir.), *cert. denied* 404 U.S. 860, 92 S.Ct. 160, 30 L.Ed.2d 103 (1971). There is no indication that the procedures of the Nebraska statute in requiring reasonable efforts to notify parents of juveniles in custody, are any more elements of constitutional due process than was the statute in that case.

Case law indicates that, in fact, there is no statutory requirement in Nebraska that a juvenile's parents be notified prior to taking his statement. *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849 (1977). In that case the defendant argued, without direct reference to the state statute, that his confession was taken without first notifying his parents, and thus was involuntary and inadmissible. The court's rejection of his claim was based on a series of Nebraska cases[3] which held that a confession,

---

**3.** Ironically, the series of cases began with *State v. McDonald,* 195 Neb. 625, 240 N.W.2d 8

(1976), the opinion of the Nebraska Supreme Court on the petitioner's direct appeal, in which

even by a juvenile, is admissible when it is knowingly, intelligently and voluntarily made, as evidenced by totality of the circumstances surrounding the confession, including his age and mental condition, and the participation of his parents. Recently the Eighth Circuit Court of Appeals, addressing Missouri's statutory parental notice requirement, held that a violation of that section alone did not render the juvenile's confession involuntary or a product of ignorance, and did not constitute a due process violation warranting habeas relief. *Rone v. Wyrick*, 764 F.2d 532 (8th Cir. 1985).

The petitioner argues that his rights were further violated by the failure of the state to provide his father with a concise written statement of the charges against him (which appears to be required by the statute only in the case of disposition under the second alternative) rendered his father unable to properly advise him regarding his statement. This claim, even if properly based in the state statute, does not have a basis in constitutional due process. *United States v. White Bear*, 668 F.2d 409 (8th Cir.1982). In *White Bear* a juvenile defendant argued that, based on the parental notice provision of the federal juvenile delinquency statute and the teachings of *Gault*, he had a due process right to have an informed and knowledgeable adult present during questioning to aid him in the exercise of his constitutional rights. The court held that the federal statutory requirement that the juvenile be advised of his rights in the presence of the parent was an additional safeguard to insure the juvenile's basic right to due process, but that the requirement itself did not rise to the level of a constitutional right. Rather, a technical violation of such a procedural safeguard is of constitutional significance only where the juvenile has, in fact, suffered a due process violation as a result of the breach. *United States v. Doe, supra.* The petitioner does not allege any prejudice to his defense based on the delay in parental notice sufficient to support a procedural due process claim. The statements challenged in this action were taken after an opportunity for consultation between the petitioner and his father. The delay in contacting his father has not been shown to have affected his subsequent statements in any way.

The petitioner asserts that had his father been apprised in writing of the charges against him, he would not have advised the petitioner to make a statement. This allegation is speculative and irrelevant. No matter how the father's action might have been influenced, there is no basis for finding that, in the absence of such written notification, either the petitioner or his father was ignorant of the nature of the charge. Thus, the failure to provide such a written statement, provided the statutory requirement does indeed apply to the petitioner's situation, is a statutory violation which, absent infringement on a constitutional right, cannot support habeas corpus relief.

The petitioner also asserts that he was deprived of constitutional due process protection by the state's failure to bring him before a juvenile court officer in lieu of releasing him under the disposition step of Sec. 43–205.02. Although no specific facts are alleged in support of this claimed statutory violation, it appears from the record that the petitioner was taken into custody in the morning of July 4, 1974, and appeared before a judge sometime on July 5, 1974, at which time a public defender was appointed and bond denied. (Supreme Court Transcript filing 3). Petitioner argues that he was not taken before a judge within the statutory "reasonable" time, presumably for arraignment although the cited statute speaks only of delivering custody of the juvenile to the juvenile court.

Under a similar provision of the federal juvenile delinquency act providing that the juvenile be brought before the court forthwith without unnecessary delay, several courts have reversed delinquency adjudications on the basis of a delay in arraignment, during which delay a statement was obtained from the juvenile. *United States v. Binet*, 442 F.2d 296 (2nd Cir.1971) (delay

the statutory violation raised in the petitioner's

brief was not directly addressed.

of more than six hours); *United States v. Glover*, 372 F.2d 43 (2nd Cir.1967) (delay of 17 hours). In *Glover*, which preceded the *Gault* pronouncement, the court stated that the provisions of the federal delinquency statute should be considered the minimum procedural requirement for safeguarding rights, as per *Miranda*, when dealing with juveniles. While *Glover* intimates that a violation of the provision for taking juveniles promptly before a judicial officer would constitute a per se violation of due process, a more recent case, interpreting a newer version of the federal statute, suggests otherwise. In *United States v. Doe, supra*, at 824, the government's deviations from the literal demands of the federal statute were considered technical violations which, because they did not contribute to the adjudication of delinquency, did not require reversal. In *Doe* the court did not characterize the statutory appearance provision as element of constitutional procedural due process.

More directly applicable to the petitioner's case, where the alleged violation is one of a similar state law provision for prompt judicial review, it has been characterized as an exclusively state law question, unsuitable for consideration in federal habeas corpus. *Paxton v. Jarvis*, 735 F.2d 1306 (11th Cir.), *cert. denied* 469 U.S. 935, 105 S.Ct. 335, 83 L.Ed.2d 271 (1984). Even if such claim were cognizable, the failure of police to take a defendant promptly before a judicial officer does not invalidate his conviction unless his defense was prejudiced thereby. *Id.* The delay in arraignment here, if any, did not result in any prejudice other than the allegedly invalid confession taken during that time. The merit of that claim will be separately evaluated. However, based on the alleged statutory violations alone, the petitioner's procedural due process claim is without constitutional merit.

## II

■ Petitioner's second claim is that certain statements made while in police custody were involuntary and should have been suppressed. Specifically, he alleges that the statements given on the evening of July 4, 1974, and the morning of July 5, 1974, were taken in violation of the Fifth Amendment because of the petitioner's physical and mental condition, the almost continuous interrogation by experienced police officers, and the advice of the petitioner's father, who is said to have been uninformed as to the nature of the charges against his son.

The trial court considered the voluntariness of these statements, as well as that of a third statement, in a suppression hearing, and ruled that the two statements at issue here were voluntarily made and admissible at trial. The Nebraska Supreme Court, on direct appeal, affirmed the ruling of admissibility, finding the statements voluntarily, knowingly, and intelligently given, *State v. McDonald*, 195 Neb. 625, 240 N.W.2d 8 (1976), and detailing the facts upon which the ruling was based. The facts as established by the state courts can be summarized:

1. With regard to the first statement, at 6:30 a.m. on the day of his arrest, the petitioner indicated that he understood the *Miranda* rights as read to him by an interrogating officer, but did not wish to make a statement without an attorney present, as which time the interrogation ended. No arrangements were made to allow the petitioner to contact an attorney or for one to be contracted on his behalf. At 9:30 a.m. officers prepared to resume interrogation, but determined that the petitioner was not in a condition to give a statement as he was sobbing, generally incoherent, and complaining of chest pains, he was 16 years old, mentally subpar, and possibly suffering the affects of alcohol he had consumed the night before. At 10:15 a.m. petitioner's father was contacted after several efforts. At 11:30 a.m. the petitioner gave his first statement while arrangements were being made for his father to see him prior to the actual interview. The statement directly implicated him in the assault but was exculpatory as to setting the fire. The tape of the statement indicated that while the petitioner appeared to understand and answer the questions, he was still agitated. He may have consumed more than a case of

beer the night before, and was at the time of the statement complaining of chest pains. (This statement was found to be involuntary by the trial court, but was introduced by petitioner at trial apparently for strategic reasons.)

2. With regard to the second statement, the petitioner was taken to the hospital and received valium for chest pains determined to have been caused by acute anxiety. He returned to the jail at 3:20 p.m. Between the first statement at 11:30 a.m. and the second statement at about 10:00 p.m., the petitioner's father was at the police station and visited with his son, advising him to tell police what he knew. No interrogation took place during that time, and there was time for the petitioner and/or his father to contact and consult with counsel at that time. In fact, an attorney was already retained by the family to represent the petitioner in juvenile court, and was scheduled to appear the next day on juvenile matters involving the petitioner. Between 10:00 p.m. and midnight, the petitioner, after signing a rights advisory form, underwent a polygraph examination during which his oral statement was obtained. The statement indicated that the petitioner had struck and robbed the victim and may have set the fire.

Although the petitioner had a relatively low intelligence level, he understood the questions asked with regard to the waiver of his rights prior to the 10:00 p.m. statement. (The trial court noted that the petitioner had effectively exercised his right to silence on three occasions in juvenile court.)

3. With regard to the third statement, the petitioner was again advised of his rights the following morning at 8:00 a.m. and signed the waiver on the rights advisory form before giving a taped statement. He indicated that he thought he had hit the victim, but wasn't sure, and that the fire had been started by another juvenile. He was not under the influence of any alcohol at that time and was calmer than he had been during previous statements. His chest pain was not of the nature that would interfere with his ability to comprehend and respond to questions.

In support of his claim that these statements were not voluntarily made, the petitioner gives his version of the interrogatories which recapitulates his testimony at the suppression hearing and emphasizes his extremely agitated and anxious physical and mental state, amplified by the fact that he was under the influence of alcohol and valium, by the failure of the police to give the petitioner his medication upon return from the hospital, and by his inexperience with rights advice and interrogation beyond the juvenile court context. He also asserts that he had to be returned to the hospital following the third statement.

The federal court in habeas actions must defer to state court factual findings, according them a presumption of correctness which can be overcome only if a review of the record shows that the state court's findings are not fairly supported by the evidence, or if the petitioner can establish that the factual determinations by the state court were erroneous. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Graham v. Solem,* 728 F.2d 1533 (8th Cir.1984), *cert. denied* 469 U.S. 842, 105 S.Ct. 148, 83 L.Ed.2d 86 (1985). *See* 28 U.S.C. § 2254(d). The petitioner does not allege any defect in the fact-finding process employed by the trial court in the suppression hearing. Rather, the petitioner's claim is based on emphasizing his own testimony in those proceedings in which he asserts that he did not understand certain key words contained in the rights advisory (most notably "self-incrimination") and that the interrogation was almost continuous during his time in police custody. In essence, the petitioner asks this court to reassess his credibility as compared to the testimony and evidence ultimately relied on by the state court. Such credibility determinations are part of the state court's factual findings and do not constitute a proper basis for federal habeas relief. *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). Thus, because the petitioner has failed to present any evidence other than his own testimony in support of his allegation that the facts are otherwise than found by the state courts, and because those factual findings are sup-

ported by evidence in the record, I am unable to consider the petitioner's version of the facts.

However, federal courts are to make their own independent determinations as to the proper conclusions of law. Thus, although bound by the state courts' factual findings, the federal court is not bound by the ultimate finding that the petitioner voluntarily waived his right to counsel in giving the challenged statements. That determination is a legal, not factual, conclusion. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Brewer v. Williams,* 430 U.S. 387, 395, 97 S.Ct. 1232, 1237, 51 L.Ed.2d 424 (1977); *Pittman v. Black,* CV82-L-553 (D.Neb. Unpublished Memorandum dated June 29, 1984 adopting magistrate's recommendation of May 14, 1984) (petitioner challenged confession made during custodial interrogation). The petitioner does not challenge the correctness of the state courts' application of the law, and I do not find it to be in any way deficient. The totality of the circumstances reflects that the petitioner was fully aware of his rights, including the right to counsel, and that he knowingly and voluntarily waived them in giving his statements.

In *West v. United States,* 399 F.2d 467, 469 (5th Cir.1968), *cert. denied* 393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969), the court enunciated nine factors which should be considered in determining the voluntariness of a juvenile's confession.[4] The factors of greatest significance in this case are that the petitioner was 16 years old, he was told of the charges against him and given Miranda warnings, he had the opportunity to consult with his father and, had he chosen, an attorney, the questioning

was not continuous nor conducted by the use of threats or beatings, and the petitioner had, prior to these statements, refused to voluntarily speak to the police,[5] and had exercised his right to silence on three occasions in prior juvenile matters. *See Paxton v. Jarvis, supra,* at 1309–1310.

Thus, I find that the challenged statements were knowing, intelligent and voluntary, and cannot support a claim for habeas relief.

### III

■ Petitioner's next claim, that the county attorney failed to comply with a state statute (Neb.Rev.Stat. § 43–202.01) requiring an affidavit in connection with charging juveniles, such as the petitioner, with criminal offenses, was characterized in my previous order as a procedural due process claim, and will be considered as such for this examination. The merits of this claim are not addressed in the petitioner's brief. The respondent argues that the statutory affidavit requirement does not apply to petitioner's case as it became effective one week after the petitioner was charged. Regardless of the applicability of the statute, or the existence of a violation by the county attorney, the claimed violation does not implicate a deprivation of federal constitutional rights, as it must to successfully state a due process claim. No argument is made that the county attorney's failure to file the affidavit deprived petitioner of fundamental fairness in the proceedings, so as to implicate a denial of due process. Rather, the claim is only that the procedural statute was violated. Thus, it is not properly considered in a federal habeas action. (See discussion of petitioner's first claim.) Furthermore, the petition-

---

4. The factors are: 1) age; 2) education; 3) whether the accused had knowledge of the substance of the charge and the nature of his right to an attorney and to remain silent; 4) whether the accused was held incommunicado or allowed to consult with relatives, friends, or an attorney; 5) whether the accused was interrogated before or after formal charges had been filed; 6) methods used in interrogation; 7) length of interrogation; 8) whether *vel non* the accused refused to voluntarily give statements on prior occasions; and 9) whether the accused

has repudiated an extrajudicial statement at a later date.

5. The petitioner did invoke his right to silence during the initial interrogation attempt in this case, at which time interrogation ceased. There is no issue as to the propriety of the subsequent interrogations here. Rather the initial invocation of the right indicates that the petitioner understood the exercise of that right and could competently waive it with regard to the statements at issue.

er fails to allege that any such statutory violation prejudiced him in any manner (i.e. that the county attorney's compliance would have changed the result of the trial). In the absence of an indication that a constitutional right was affected by the alleged violation of a state statute, and that the petitioner suffered prejudice as a result, I find this procedural due process claim to be without merit.

## IV

■ The petitioner's fourth claim is that he was denied the effective assistance of counsel because of his defense attorney's failure to object to evidence of an experiment conducted by the state's expert, and his failure to raise the state's alleged noncompliance with statutory procedures for taking juveniles into custody.

The evidence showed that the petitioner and another juvenile hit the victim over the head and put him in the trunk of his car. Police discovered the body while investigating a fire which broke out inside the victim's car a short time later. Testimony indicated that the victim died of asphyxiation from the fire, although he might eventually have died of the head wound inflicted by his assailants. The issue of whether the fire had been accidentally or deliberately set was critical to the defense. The prosecution introduced expert testimony on possible causes of the fire, as well as evidence of an experiment, the results of which indicated that accidental ignition of the fire was very unlikely. The testimony and exhibits with regard to the experiment, conducted the weekend before the trial, were admitted into evidence over the objections of defense counsel, after his motion in limine had been implicitly denied.

Petitioner asserts that his counsel, Paul Watts, failed to investigate the circumstances of the fire in the car and the conditions under which the experimental seat burning was performed resulting in his inability to successfully challenge the foundation for the admission of the experiment results. He maintains that his counsel's sparse preparation in this respect prevented him from establishing the possible dis-similarities between the experimental seats and those burned in the victim's car, or comparing the conditions under which the fire and the test burning took place, resulting in the admission of evidence essential to petitioner's conviction.

To state a claim for ineffective assistance of counsel, the petitioner must 1) identify the acts or omissions of counsel that fall outside of the wide range of professionally competent assistance and 2) demonstrate prejudice by showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Whatever counsel's alleged omissions, the record reflects that he sought to exclude the experiment evidence by an oral motion in limine. The motion, which the court heard in chambers immediately preceding the trial, was based on the inability of the prosecution to show the condition of the victim's car prior to the fire with regard to the seats or the presence of the flammable materials in order to establish the experiment as sufficiently comparable to the actual fire to be admitted. The motion was taken under advisement and, without expressly ruling, the court allowed the presentation of the experiment evidence over defense counsel's foundational objections, several of which were made after the testimony had already been elicited.

The state's experiment was conducted by Horton Dahlquist, Chief of the Omaha Arson Investigation Bureau, who testified that the tests were conducted on a car seat from a 1968 Ford Galaxy (model and year of victim's car) which was removed from a car and placed in an enclosed room to simulate the conditions inside a car. Two lit cigarettes were placed on the seat, one on the flat cushion part and one in the crevice between the cushion and the seat back, both of which self-extinguished in about three minutes with no damage to the seat. Next, a burning cardboard match from a match book was dropped onto the seat and burned itself out in five minutes, leaving a small discoloration. Then two burning

matches together were dropped onto the seat, and finally a whole book of matches were ignited and placed on the seat. The book of matches burned out in about four minutes and left discoloration and some melting of the Naugahyde seat cover.

In the next phase of the experiment, the seat was taken to a garage with the door open where attempts were made to set it on fire from underneath with a match, rolled newspaper set afire, and by lighting straw placed beneath the seat. Only the burning straw ignited the seat and it burned slowly and moderately. The seat was then taken outside and reignited, burning vigorously and then slowly and eventually slowing down. While it was burning the top foam rubber padding under the seat cover was exposed and a lit book match placed on it. The match extinguished itself in one minute and left a brown spot on the foam rubber. Exhibits offered and received with regard to the experiment include a sample of the seat covering used in the experiment (exhibit 36) and pictures of various stages of the experiment. Dahlquist concluded from the experiment that an accelerant was used to start the car fire. That, and his experience as arson investigator, led him to believe that the July 4 fire was deliberately set. (Bill of Exceptions, 606–618.)

The state called two witnesses to establish, as foundation for the experiment, that the condition of the seat and interior of the victim's car was similar to the condition of the seat used in the experiment. The former owner of the car, Kay Lawson, testified that when the car was sold to the victim in 1973 it had the original seats and equipment and the upholstery was in very good condition. She identified the upholstery sample and experiment pictures (exhibits 36–40) as appearing to be the same seats as in the car she sold. Although she indicated that she had no knowledge of the condition of the car after the sale, she testified that no major work or repair had been performed on the car during her ownership. (Bill of Exceptions, 577–581). The victim's sister, Janice Mongar, testified that she had driven the car frequently and had last seen it on the Monday or Tuesday before the incident. She described the interior as clean and neat, kept spotless by her brother. The seat covers were in good condition and without holes. She also testified that the seats depicted in the pictures of the experiment and the upholstery sample appeared to be like that in the victim's car. (Bill of Exceptions, 582–585.)

In the post-conviction proceedings on this claim, Watts testified that his failures to timely object to the experiment evidence after his unsuccessful motion in limine were trial strategy in that some of the state's foundational testimony was identical to what he would need to qualify his expert, a mechanic testifying with regard to electrical and carburetor fires in cars. Basically, Watts testified that he thought the state's experiment was admissible, or at any rate would be admitted by the court. Even if it wasn't, Watts felt he needed to obtain an expert who could testify as to the possibility that the fire was accidental in order to refute the possible inference of arson from the circumstantial evidence. As foundation for the testimony of his expert, Watts said he would have had to introduce evidence as to various aspects of the condition of the victim's car, which would open the door for the state's experiment evidence at that point, even if it had been previously excluded. His strategy was to let the state present the experiment evidence and foundation therefor, which would allow him to present his expert on the subject, without objection by the prosecution as to foundation. Apparently, the foundation evidence which would be common to both experts included the experimental seat, which Watts said he would have had to produce for his expert, and the testimony of the victim's sister to show the similarity between the experimental seat and the seats in the victim's car.

As indicated in the recitation of the elements necessary for a successful ineffective assistance of counsel claim, the petitioner here must establish that his defense was prejudiced by his counsel's failure to investigate and object to the state's experiment. Prejudice is shown by establishing

that, but for the counsel's unprofessional errors, the result of the proceeding would likely have been different. *Strickland v. Washington, supra.* Thus, it must be established that had Watts timely objected to the experiment evidence, the court would have found it inadmissible on the basis of intolerable dissimilarities between the experiment and the incident discovered through his investigation.

Under Nebraska law, as correctly stated by the district court in the post conviction action, the general rule is that evidence relating to an illustrative experiment is admissible if a competent person conducted the experiment; and apparatus of suitable kind and condition was utilized; and the experiment was conducted fairly and honestly. *Shover v. General Motors Corp.,* 198 Neb. 470, 253 N.W.2d 299 (1977). In that case defendant's expert demonstrated the steering behavior of a car with a broken tie rod adjusting sleeve by an experiment which involved removing that equipment from a test car of the same make and model as plaintiff's car at 65 m.p.h. (speed of plaintiff's car on impact with guard rail) on a test track. The plaintiff objected to the admissibility of the test results on foundational grounds, in that the circumstances of the test and the incident were not similar; the entire tie rod had been removed, not just the part alleged to have caused the accident, the test driver was aware of the condition, it was not shown that the test car had been driven a comparable number of miles, the test car had only one passenger and no cargo while the plaintiff's vehicle held four people on a vacation, the test was not conducted on the turnpike where the accident occurred, and the test car required special engineering knowledge to drive it. The court held that those matters did not affect the validity of the experiment as it is not essential that conditions existing at the time of the experiment be identical with those existing at the time of the occurrence as long as there is substantial similarity. Furthermore, the trial court has a wide discretion in determining whether evidence relating to illustrative experiments should be received. *Id.* at 474–475, 253 N.W.2d 299. This eviden-

tiary standard applies as well to the criminal context *State v. Jones,* 213 Neb. 1, 328 N.W.2d 166 (1982) (luminol testing by forensic serologist to identify bloodstained areas of scene).

In this case the petitioner does not allege exactly what dissimilarities between the experiment and the occurrence would have come to light had Watts properly investigated and familiarized himself with the facts of both situations. Rather, the petitioner relies on his counsel's testimony in the post conviction hearing approximately four years after the trial to say that counsel did not even have knowledge of the condition of the car at the time of the fire for comparison purposes. (Bill of Exceptions in post conviction action, at 20) (Watts did not recall whether the windows were up or down in the car or broken out from the fire). The petitioner does not challenge Dahlquist's qualifications as conductor of the experiment, nor is there an argument that the experiment was not conducted fairly and honestly. Rather, the petitioner's challenge is to the unsuitability of the apparatus as not substantially similar to the original.

From the record it appears that the car seat used in the experiment was substantially similar to that burned in the victim's car. Both seats were original to a 1968 Ford Galaxy. Both were covered with the same Naugahyde upholstery material. For the experiment, the purpose of which was to determine the flammability characteristics of that seat (Dahlquist testified that the fire originated with the seat upholstery), the experimental seat appears to have been substantially similar to that involved in the fire. Additionally, the experiment was conducted under various circumstances to simulate possible conditions in a vehicle (enclosed room, partially enclosed garage and in the open), none of which resulted in a fire of the intensity and rapidity of that which consumed the car. Thus, no matter what the conditions inside the car as to available oxygen and possible wind, substantially similar conditions were simulated in the experiment. The experiment was offered as a partial basis for Dahlquist's conclusion that some kind of

accelerant had been used to start the fire, and because of that, and his experience in investigating arson, he believed that the fire had been deliberately set.

It is true that the victim's sister testified that she had seen the car earlier in the week of the incident, which would leave at least several days for the interior of the car to have changed appearance (i.e., papers or other combustible materials on the floor, under or on the seat). Additionally, remnants of a small pressurized can, contents unknown, which exploded in the fire were found in the car after the fire (Bill of Exceptions, 616–617). No such material was used as a variable in the experiment. Although, as to the position of the seat in the car with respect to other flammable interior coverings or as to possible accelerants under or on the seat, it cannot be determined whether the experiment is similar to the actual condition of the car, the experimental results are not based on any such similarity. Dahlquist's conclusion from the experiment was that an accelerant (paper, flammable liquids, anything that would encourage burning beyond normal ignition (Bill of Exceptions, 618) had been used to set the fire. While this conclusion does not discount the possibility that an accelerant had been stored under or on the seat and inadvertantly ignited, in the absence of some evidence to that effect, the expert's opinion was that the accelerant had been deliberately introduced. The experiment itself showed only that, whether accidentally or deliberately ignited, an accelerant would be needed to produce in similar seats the intense and rapidly-burning fire which consumed the victim's car.

It appears from the record that the experiment evidence was properly admitted, and neither further investigation nor timely objection by Watts on foundational bases would have successfully excluded it, thereby changing the result of the trial. In the absence of evidence establishing differences more substantial than these, I find that the petitioner cannot show prejudice from his counsel's failure to investigate the procedures of or object to the state's experiment evidence.

The petitioner adds, but does not expand in his brief, the assertion that his counsel was also ineffective by failing to raise the non-compliance by the state with statutory procedures for taking a juvenile into custody under Neb.Rev.Stat. §§ 43–205.01 and 43–205.02 (Reissue 1975). However, my previous order discussing the possible waiver of this claim by petitioner notes that the issue of statutory non-compliance was raised in the state courts. Indeed, the post conviction court recognized that counsel had raised the issue in a motion to suppress, which was denied, in a motion for new trial, which was denied, and in his brief on direct appeal. Petitioner's claim that counsel was ineffective in not raising the statutory issue is resoundingly contradicted by the record. In any event, the petitioner's substantive claims in this regard have been rejected, so no prejudice resulted.

The petitioner's ineffective assistance of counsel claim, both on the basis of the failure to object to the state's experiment evidence and failure to raise the statutory violation, is without merit.

I previously left open the possibility of holding an evidentiary hearing if necessary to consider the merits of the petitioner's claims as well as determining whether any claims had been waived. However, as it appears that the grounds for the petition are without merit, I will recommend that the petition be dismissed without a hearing.

IT THEREFORE IS RECOMMENDED:

1. The petition for habeas corpus be dismissed for failure to state a cognizable claim under 28 U.S.C. § 2254, unless within ten days of the receipt of a copy of this recommendation, the petitioner files an objection pursuant to 28 U.S.C. § 636(b)(1).

2. The petitioner is hereby notified that unless objection is made within ten days after being served with a copy of this recommendation, he may be held to have waived any right which he may have to appeal the court's order adopting this recommendation.